THE PEOPLE *ex rel.* John E. W. Wayman, State's Attorney, Relator, *vs.* GEORGE B. CHAMBERLAIN, Respondent.

*Opinion filed October 26, 1909—Rehearing denied Dec. 8, 1909.*

1. ATTORNEYS AT LAW—*an information to disbar, under statute, need not be presented by injured client.* Under section 7 of chapter 13 of the Revised Statutes, which provides that "any person interested" may apply to the Supreme Court for a rule upon an attorney to show cause why he should not be disbarred for failing to pay over money collected for a client, it is not necessary that the information shall be presented by the injured client.

2. SAME—*power of Supreme Court to disbar does not depend upon statute.* The power of the Supreme Court to disbar an attorney is an inherent one, which exists independent of any statute on the subject; and if it is shown that an attorney has collected money for a client which he wrongfully refuses to pay over under circumstances which satisfy the court that he is acting fraudulently and in bad faith the court may disbar him, regardless of whether or not the case comes technically within the provisions of section 7 of the Attorneys and Counselors act.

3. SAME—*fact that client has settled does not preclude inquiry into the transaction.* The fact that a client has settled with his attorney for money collected does not preclude subsequent inquiry into the moral and professional character of the attorney's acts, and if it is shown that he has acted in bad faith toward such client, and has obtained, by misrepresentation and concealment of facts, money to which the client is rightfully entitled, the Supreme Court may disbar the attorney notwithstanding such settlement.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

B. D. MAGRUDER, and THOMPSON W. HOAGLAND, for respondent.

Mr. JUSTICE VICKERS delivered the opinion of the court:

This is an information filed by the State's attorney of Cook county, at the relation of the grievance committee of the Chicago bar association, against George B. Chamber-

lain, for the purpose of having the license of said Chamberlain to practice law revoked and his name stricken from the roll of attorneys of this court.

Respondent was duly licensed as an attorney and counselor at law under the rules of this court on the 28th day of March, 1896. It appears from the record in this case that in connection with his law practice the respondent conducted a mercantile and collection agency under the name of "The Lafayette Mercantile Agency," under which name respondent furnished to subscribers information concerning the financial standing and responsibility of merchants and received and collected claims on a commission basis. The Lafayette Mercantile Agency was not incorporated nor is it a partnership. So far as the record discloses, no person other than respondent had any interest in the business of the agency. The first charge in the information relates to respondent's business transactions with a brokerage concern doing business in Chicago under the name of Buckley & Co. On October 18, 1898, Buckley & Co. entered into a written contract with respondent's mercantile agency by which it was provided that Buckley & Co. employ said agency for a period of one year to procure and transmit to them information respecting the responsibility and commercial rating of persons concerning whom Buckley & Co. should inquire, and for this service Buckley & Co. agreed to pay a stipulated sum, the receipt of which was acknowledged. Said contract provided for commissions on collections, as follows: "No charges less than two dollars. On all sums not exceeding $300, ten per cent; on sums from $300 to $1000, ten per cent on $300 and five per cent on the balance; on sums over $1000, two and one-half per cent. For all collections settled by patrons while in the hands of this agency subscribers must pay our fees as stipulated. All moneys promptly remitted when collected. We wish it distinctly understood that this agency does not sue all claims committed to their hands, but will push all stale claims and satisfy

our subscribers that we have done all in our power to settle
the same."

During the year that the foregoing contract was in ex-
istence Buckley & Co. placed a large number of claims in
respondent's hands for collection.    Among the claims thus
placed with respondent were four judgment notes made by
Louis Nagel, of Weston, McLean county, Illinois, payable
to the order of Gants, Barnes & Co. and by them endorsed,
all of said notes being dated May 18, 1894, and payable as
follows:   One for $200, due one year after date;  the sec-
ond for $200, due two years after date;  the third for $250,
due three years after date;  and the fourth for $289, due
four years after date,—all of them bearing interest at the
rate of seven per cent per annum.   These notes were placed
in the hands of respondent for collection on December 13,
1898, through Preston Gants, who at that time was in the
employ of said Buckley & Co.   Gants was one of the origi-
nal payees and endorsers of these notes, and it appears that
prior to the time the notes were turned over to respondent
Gants had become the sole owner of said notes, and the
assignment to Buckley & Co. was to secure an indebtedness
due them from Gants.   Respondent held these notes until
April 17, 1900, when he sent the first one of the series to
a corresponding attorney by the name of Henning for col-
lection.    In his letter transmitting the note to Henning re-
spondent said:   "The terms of collection are on the enclosed
slip that accompanies this note,—two-thirds of ten per cent
to you and one-third to us."   Nothing appears to have been
done either by the respondent or Henning toward collecting
this note until in May, 1905, when judgment was confessed
on it a day or two before the Statute of Limitations would
have become a bar against an action on it.   On June 1,
1905, Henning reported to respondent that Nagel had paid
the judgment and costs in full, amounting to $372.75.   On
June 3, 1905, respondent received a draft from Henning
for $335.90, being the proceeds of the judgment after de-

ducting ten per cent fees. On June 7 Henning reported to respondent that he had caused judgment to be confessed upon the three notes remaining unpaid in his hands for $1385.17, being the full amount of principal, interest and attorney's fees due according to the tenor of the notes. On June 16, 1905, respondent wrote Henning a letter referring to a long distance telephone conversation, in which Henning had informed respondent that Nagel had offered to pay $1000 cash in full satisfaction of the second judgment. Respondent advised Henning to use his best judgment in reference to the proposed settlement. Henning accepted Nagel's proposition, received $1000, and after deducting fees, costs, etc., on June 21, 1905, sent respondent a draft for $864.48, net proceeds of said settlement. This draft, as well as the former one for $335.90, making a total of $1200.38, was received by respondent, but no part of it was reported to or paid over at the time by respondent to his clients. Some time after the notes were placed with respondent for collection, and before they were paid, Gants discharged his obligation to Buckley & Co. to secure which these notes had been pledged and the notes again became Gants' property, discharged of any lien in favor of Buckley & Co. There is some uncertainty, due to respondent's contradictory statements, as to the time when he first learned that the notes had again become the unencumbered property of Gants. On June 17, 1905, after he had received the first remittance from Henning, respondent wrote to Gants, saying that he could not report on the Nagel matter at that time but that he hoped to be able to drive Nagel to a satisfactory settlement in a short time; that when he did he would report to Buckley & Co. and make a settlement with them. He says: "The notes were outlawed on the 18th of May, so whatever is gotten out of this thing is just so much money found." At the time this letter was written respondent knew that judgment had been entered upon all of the

notes, that the first one had been paid in full, and that Nagel had offered $1000 in settlement of the second judgment.

After the settlement of these claims with the respondent Gants made numerous unsuccessful attempts to obtain an accounting from respondent in regard to the money collected on the Nagel notes. Respondent insisted that he had a counter-claim against Buckley & Co. for commissions on various sums which had been paid to Buckley & Co. on claims which were in respondent's hands for collection, and he insisted that he would not pay over any part of the money received from Nagel until he had an opportunity to look through the books of Buckley & Co. to ascertain the amount due him for commissions by payments made directly to Buckley & Co. on claims in respondent's hands for collection. On September 6, 1905, having failed to obtain any satisfactory settlement with respondent, Buckley & Co. and Gants employed John T. Richards, an attorney and member of the Chicago bar, to procure an accounting and settlement from respondent, and gave Richards a letter of authority in which they asked respondent to pay Richards all sums of money remaining in respondent's hands belonging to either Buckley or Gants. Afterwards Richards presented his letter to the respondent and opened negotiations looking to an adjustment of the account. On October 17, 1905, Buckley made a statement to respondent of all sums collected by them on claims in respondent's hands for collection, showing that they had received on the Reedy claim $12, from Frank Spear, $81.25, and from A. L. Jones, $223.41, making a total of $316.66. Respondent claimed that there were other collections made by Buckley & Co. on which he was entitled to commissions, but there is no proof to support such claim. Richards frequently asked respondent to make a statement of the total amount of commissions he considered himself entitled to, but respondent neglected to comply with such requests. Finally Richards asked respondent what settlement he was willing to make, and re-

spondent thereupon offered to pay $300 in full discharge of the Buckley claim against him. This offer was not accompanied with any statement showing on what account the respondent proposed to retain the balance in his hands, amounting to about $900. Richards offered to accept $750 and release respondent, but this proposition was declined. On February 7, 1906, Richards sent to respondent a formal written demand for the statement of his claims, and having failed to get such statement Richards wrote him again, under date of March 5, 1906, demanding a statement, and intimating to the respondent that a resort to other measures would be had if the desired information was not forthcoming. Respondent replied to this demand, refusing to make any statement. On March 30 Richards again wrote respondent, specifying in detail the information that was desired, and notifying the respondent that unless he made such statement or furnished such information by April 4 he would take such steps as his judgment might dictate in relation to the matter in controversy. To this letter respondent made no reply. On April 17 Richards brought the matter to the attention of the grievance committee of the Chicago bar association. Respondent then offered to pay $350, which Richards declined. The formal charge, and respondent's answer thereto, having been filed with the grievance committee, the matter was heard from time to time by said committee. After the hearing was completed respondent was advised that the grievance committee had voted adversely to him, and a day or two thereafter he sought Richards and asked him if he would accept $550 in settlement of the claim of Buckley and Gants, and Richards told him that he would, and afterwards, on March 12, 1907, respondent paid Richards $550 and took a receipt, which recited that it was "in full settlement, satisfaction and discharge of all claims and demands" which Buckley or Buckley & Co., Gants Bros. and Preston Gants had against the respondent or the Lafayette Mercantile Agency "for and

on account of any matter or thing whatsoever, from the beginning of the world to the day and date hereof."

Respondent claims that Buckley & Co. compromised a claim against Albert L. Jones and accepted $223.41 in full of a claim for $676.25, and that if said claim had not been settled he could have collected it in full, thereby earning $48.81 commission instead of $22.34. Conceding that respondent was entitled to have full commission on the Jones claim instead of the amount that was actually collected, and ten per cent upon the amount of the other collections, including the Nagel claim, and the costs paid thereon by him, the total amount for which respondent was entitled to credit was $143.78, which, deducted from $1200.38, leaves a balance of $1056.60 in the hands of respondent which he settled with his clients for $550.

Respondent claims that the information and the evidence does not bring the case against him within the provisions of section 7 of chapter 13 of the Revised Statutes, in regard to attorneys, which provides as follows: "In all cases where an attorney of any court in this State, or solicitor in chancery, shall have received, or may hereafter receive, in his said office of attorney or solicitor, in the course of collection or settlement of any claim left with him for collection or settlement, any money or other property belonging to any client, and shall, upon demand made, and a tender of his reasonable fees and expenses, refuse or neglect to pay over or deliver the same to the said client, or to any person duly authorized to receive the same, it shall be lawful for any person interested, to apply to the Supreme Court of this State for a rule upon the said attorney or solicitor, to show cause, at a time to be fixed by the said court, why the name of the said attorney or solicitor should not be stricken from the roll," etc. It is argued that under this section of the statute an information can only be presented by the client who is injured by the refusal of the attorney to pay over money which he has collected. In the case of

*People* v. *Palmer,* 61 Ill. 255, this court construed the words "any person interested," which appear in this statute, to include not only creditors of the attorney but members of the legal profession and other persons who have an "interest in the purity of those who sustain such important relations to the public." This court grants licenses to persons to practice law and is to some extent responsible for the honesty and capacity of those who by its authority are so authorized to practice. The power to disbar in a proper case those who have been proven unworthy members of the legal profession is indispensable to the maintenance of a high standard of professional conduct. The exercise of this power cannot be made to depend upon the inclination to prosecute by the particular client who may happen to be the victim of an attorney's misconduct.

Respondent further contends that the proof fails to show that he had been tendered his fees, and that in this respect the case is not made out under the statute above quoted. The power of this court to disbar an attorney is one of those inherent powers which exist independent of any statute on the subject, and when it is shown that an attorney collects money for his client and wrongfully refuses to pay the same over to him, less the amount of his fees, if the circumstances attending the transaction are such as to satisfy this court that the attorney is acting in bad faith or with a fraudulent purpose a proper case for disbarment will be made, regardless of the technical requirements of the statute above referred to.

Respondent further contends that the settlement with his clients upon a basis that was satisfactory to them is a defense to this information. We cannot assent to this view. The relation of attorney and client is so intimate and the influence which the attorney has is so great that it would not do to establish the rule that any transaction to which it can be shown that a client has agreed must be regarded within proper professional bounds. Clients may be induced

through stress of circumstances to agree to any settlement proposed, however unfair it may be, rather than resort to legal proceedings to obtain their rights. The fact that such settlement has been made will not preclude an inquiry into the moral and professional quality of the attorney's acts prior to and in connection with such settlement. In the case at bar respondent collected $1200 on the Nagel notes. Having received this money, which belonged to his clients, it was his duty to report the collection to them and pay over the amount due them after deducting his proper fees and other charges. Instead of doing this, he reported, after he had received a part of the money and knew the prospect was good to settle the balance, that the notes were outlawed and that anything received on them would be the same as so much money found. After the money was all paid over he refused to make any statement of his counter-claim, and by his neglect and delay made it necessary for his clients to employ another attorney to adjust the matter. After repeated efforts of Mr. Richards to obtain a statement of respondent's counter-claim, and after it had been strongly intimated that a resort to some coercive measures would be had, respondent offered to pay $300 in full settlement of the claim. Afterwards, when the matter was in the hands of the grievance committee of the bar association and after respondent knew that the committee were adverse to him, he paid about fifty per cent of the claim and took a receipt therefor in full. We are impressed by the evidence in this record that respondent was not acting in good faith with his clients in setting up his several pretenses for not paying over this money, and that by his course of dealing with his clients he finally succeeded in procuring a settlement by which he retained a considerable sum of money to which he was not entitled.

There are other matters charged in the information, the merits of some of which are now in litigation. In view of the conclusion we have reached in regard to the charge al-

ready considered we do not deem it necessary to express any views in respect to the other charges in the information. Respondent's conduct in connection with the transaction above discussed is such as to satisfy this court that he is unworthy to continue to exercise his professional calling and that his name should be stricken from the roll of attorneys of this court  It will therefore be so ordered.

*Rule made absolute.*