[No. 7223.]

THE PEOPLE EX REL COLORADO BAR ASSOCIATION V. IRWIN.

1. ATTORNEYS—*Judicial Discipline.* The authority of the courts to discipline attorneys for professional misconduct, either by suspension or disbarment, is inherent, and has been held not subject to statutory regulation. (186.)

2. —— *Confusing Trust Funds.* With private moneys is highly censurable. (182.)

3. —— *Unprofessional Conduct—Punishment.* The degree of punishment may be varied from mere rebuke to disbarment, according to the circumstances.

The respondent represented one who had been convicted of felony, and received from the mother of the accused a sum of money to be applied to the cost of preparing a transcript of the evidence, and the record, as the foundation of an application to the Supreme Court for a writ of error. He neglected the matter, no transcript was prepared, and his client was committed to the penitentiary. He failed to return the money, alleging that the mother of the convict had consented that he should apply it upon a balance of fees due him. This was contradicted by the lady; but the testimony was conflicting and the court was not able to resolve the question against respondent.

. Respondent was a man of about fifty-six years of age, and had been engaged in the practice of law as his only occupation for many years. The record disclosed no other instance of unprofessional conduct, and he pleaded illness in excuse of his neglect.

No complaint against him was presented until the lapse of two years from the occurrences, and no testimony was taken until nearly three years thereafter. The court were unable to say that there was an intent on the part of respondent to wrong his client, but in view of the whole record were impelled to the conclusion that his conduct was so grossly negligent as not to be excused.

It was therefore ordered that respondent be suspended from the exercise of his profession for the space of six months. (181-188.)

The court observe upon the negligence of those having charge of the complaint in not pressing it to a hearing at an earlier date. (184.)

*Proceedings in disbarment.*

Mr. JOSEPH D. PENDER, Mr. JAMES G. ROGERS, for relator.

Mr. L. M. GODDARD, for respondent.

C. A. IRWIN, pro se.

SCOTT, J., delivered the opinion of the court.

Frank Kiser was charged in the District Court of Boulder County, with the commission of a felony. Nellie A. Kiser, mother of the defendant, employed the respondent to defend him. This he did, and the first trial resulted in a disagreement by the jury. A second trial was had, resulting in the conviction of the defendant and his sentence to the penitentiary. The respondent represented the defendant in the second trial.

The defendant was convicted on or about April 28th,

1908; his motion for a new trial denied, and sentence pronounced about June 5th, 1908. The respondent prayed for an appeal and secured an order staying execution of the sentence for a period of sixty days, and granting a period of ninety days in which to make and tender the defendant's bill of exceptions.

The respondent represented to the mother of defendant, that it would require approximately $335.00 to pay for the transcript of the record, and the costs in the Supreme Court. The court reporter had presented to respondent a written estimate of the cost of the transcript at $275.00, dated June 5th, 1908, with the statement that $200.00 must accompany the order for it. The sum of $335.00 was paid to respondent in the amounts and at the times as appears from the receipts signed by himself and his firm as follows: June 10th, 1908, two hundred and fifty dollars. This receipt states the purpose to be, "to apply on cost of appeal, *State v. Kiser,* to Supreme Court," and is signed "Irwin and Brown."

The respondent says that he personally received this money but turned it over to his partner Brown, who executed the receipt. The respondent received fifty dollars to be applied for the same purpose for which he personally gave his written receipt dated the 16th day of June, 1908. There appears also a later receipt for the remaining thirty-five dollars which was received by the respondent from Mrs. Kiser, and to be used for the purpose named.

June 23d, 1908, the respondent made a written request of the court reporter, for the transcript of record, enclosing his personal check for $150.00. It will be observed that at the date of this written request for the transcript, the respondent had received from Mrs. Kiser the sum of $300.00 to cover the cost. Three days later, June 26th, 1908, the court reporter mailed a letter to the respondent which contained the following:

"The check which you sent me on account of the record in the case has been returned endorsed 'no funds.' I desire

to advise you that when you send me a draft for $200.00, I will commence work on this record, and not before."

The repudiated check was returned to the respondent on the following day. The respondent took no further action until the Friday before the 5th day of August, the latter being the day on which the stay of execution expired, when he was called over the telephone from Boulder, by Mr. Charles B. Ward, an attorney and friend of Mrs. Kiser, but not employed in the case.

Mrs. Kiser had that day learned from the District Attorney, that no transcript had been prepared, and that it was then too late to secure it within the time for which the execution was stayed, and had appealed to Mr. Ward, who proceeded to call Mr. Irwin over the telephone.

The defendant Kiser, was taken to the penitentiary on the day following the expiration of the stay of execution. The respondent did not return the $335.00 so paid by Mrs. Kiser, but applied the same on what he says were unpaid fees, and with the consent of Mrs. Kiser.

This state of facts forms the basis of the charge in this case, of gross professional malconduct upon the part of the respondent, and the rule to show cause why his name should not be stricken from the roll of attorneys licensed to practice law in this state.

In answer to and in explanation of the charge, the respondent contends: That his agreement with Mrs. Kiser and her son, was that he was to receive for his services for the first trial the sum of five hundred dollars, and an additional five hundred dollars in case of acquittal, and that the same terms were afterward mutually agreed upon for his services for the second trial, and therefore there was due him the sum of five hundred dollars for services in the second trial, and upon which he applied the three hundred and thirty-five dollars, with the consent of Mrs. Kiser, obtained after the defendant was confined in the penitentiary.

The testimony upon this disputed question of fact is

conflicting, and clearly not so convincing as to justify a finding by this court against respondent in this character of proceeding.

It is agreed that Mrs. Kiser paid to Mr. Irwin the total sum of $500.00 for services, and that this sum was in payments made before, during and after the first trial.

It may be said that the receipts for this money all show that the payments were expressly stated to be for services during the first trial.

Further, that the testimony is so conflicting as not to be convincing that Mrs. Kiser did not afterward agree that the sum paid to the respondent to be used as costs, should be applied on fees due the respondent. It is not important to definitely determine these questions in this proceeding.

The gravamen of the misconduct charged, is the failure of the respondent to use the sum paid him for the agreed purpose and which failure resulted in defendant's loss of his right to apply for a supersedeas. The respondent testifies that before sending his check for $150.00 to the court reporter, he called the latter over the telephone and asked if he would begin the work, if respondent would send him that amount, and received an affirmative answer. This is confirmed by a letter of the reporter, dated June 24th, in which he says:

"I have your favor of the 23d inst. ordering bill of exceptions in the Kiser case and enclosing your check for $150.00. I will get at this record as soon as I can."

From the date of the letter notifying Irwin of the refusal of the bank to pay his check and the demand of a deposit of $200.00 to about the last day of July, and until Mr. Ward called him over the telephone, he had made no inquiry or effort to ascertain whether or not the transcript was being prepared.

He explains the giving of the check by saying that before writing and mailing it he called up the bank and learned that at the time, he had a balance on deposit of $153.00, or

more than enough to cover the check. The bank books of that date show he had at the time the amount stated to his credit. The testimony is confusing as to whether this deposit was reduced by the payment of an outstanding check or checks, or the return of a check theretofore deposited by Irwin before the receipt by the bank of the $150.00 check. In any event, when the latter check was received by the bank, Irwin's balance was not sufficient to pay the check, and payment was refused.

The respondent explains his failure to send the reporter the two hundred dollars thertofore demanded as a deposit, and the use of his private check for a smaller sum, by saying that all moneys received or handled by the firm were turned over to his partner, Brown; that there was no firm account kept, and that Brown was out of the city at the time.

But the money so received was to be used for the purpose of paying costs, and should have been deposited as a trust fund, and not mingled with the private funds of either partner.

An attorney has no moral right to mingle trust funds with his own, nor to deposit these as a part of his own private account. To do so is highly censurable and likely to prove embarrassing, and even dangerous, however well intended.

Respondent further testifies that from the time of the trial up to the time of the telephone call from Mr. Ward, he was quite ill, and confined to his house the greater part of his time. That his offices were moved in his absence, and his mail and papers were in confusion, and that his first knowledge of the repudiation of the check, and of the letters of the court reporter, came to him through Mr. Ward in the telephone conversation, whereupon he made a search, and found the letters, and that he had theretofore believed the transcript had been prepared.

On the same day of the call from Ward, or on the following day, the respondent proceeded to Boulder in an

effort to remedy the situation, believing as he says, that he could secure an extension of the stay of execution. But he made no such application, either to the trial court or to the Supreme Court, either before or after the expiration of the time fixed by the original order.

He contends that Mr. Ward advised that it was too late to secure such an extension, and that Mrs. Kiser told him to consult with Judge Mullins of Denver, and that he should be governed by the advice of Judge Mullins, with the consent of her son.

It appears that the respondent proceeded also to the penitentiary at Canon City, and visited Frank Kiser, who was at the time there incarcerated, and was told by Frank to abide by the judgment of Judge Mullins. That he afterward presented the whole matter to Judge Mullins, and to Mullins' law partner, and that after a full discussion of the case and the errors assigned, it was the opinion of Judge Mullins and his partner, that there was little or no chance for a reversal of the judgment.

Judge Mullins corroborates the testimony as to this conversation, and as to his conclusion, at the time, that there was very little hope of a reversal, and as to his advice, that inasmuch as Mrs. Kiser was very poor, the application should be abandoned, and that Mrs. Kiser might better use what little money she had, or might secure, in an effort to obtain a parol or pardon. Judge Mullins acted in the matter solely as the friend of Mrs. Kiser, and in no sense in the capacity of her attorney.

The respondent testifies that he then saw Mrs. Kiser and presented the view to Judge Mullins, and that the advice of Mullins was accepted by her, and for such reason he proceeded no further in the matter of review by this court.

Upon the whole record we cannot say that there was an intent upon the part of the respondent to perpetrate a wrong upon his client, but are forced to the conclusion that his conduct was so grossly negligent that it should not and

cannot be excused, though, for reasons afterward to be observed, he should not be disbarred.

It appears that the respondent is a man of about fifty-six years of age and has been engaged in the practice of law as his only occupation for many years, and the record discloses no other instance of alleged unprofessional conduct. Neither is there any suggestion of immoral conduct, nor that he is not regarded as a truthful man.

There is another circumstance that deserves consideration. The acts charged, are alleged to have occurred in June and July, 1908, and the petition was not filed until July 5th, 1910, or two years thereafter. Stipulation that the testimony might be taken before a referee was not filed until March 18th, 1912, or nearly two years after the petition was filed, and the testimony not taken until a year later, and the case is now presented for consideration at a time more than seven years after the occurrence.

This presents a case of disagreeable staleness, and of negligence upon the part of those whose duty it is to present such matters promptly for the consideration of the court. For seven years the respondent has been practicing law in this state, after the alleged commission of the acts for which it is now urged that his license should be revoked, and five of these years had passed before any testimony was taken in support of the charge.

While it is clear that the money deposited with the respondent was for the purpose of paying costs, yet the testimony does not satisfactorily establish that demand was made for it, or that it was not agreed that it should be applied on earned or agreed fees. The only testimony upon this point is that of Mrs. Kiser, an aged woman, perhaps justly nursing a feeling of wrong, and five years after the occurrence. All of this testimony is flatly contradicted by the respondent.

The right to discipline attorneys by suspension or disbarment is inherent in courts and has been exercised from

the earliest times.  Ex Parte Bradley, 7 Wall, 74 U. S. 374,
19 L. Ed. 214.  This court has not at all times recognized
the power of suspension.—*People ex rel. v. Green,* 9 Colo.
535, 13 Pac. 514.

It seems to have been the general view of law writers
and most courts, that rigid and severe punishments have
not been conducive toward a better or more effective en-
forcement of the law.  Blackstone observes that:

"As a conclusion of the whole, we may observe that
punishments of unreasonable severity, especially when in-
discriminately inflicted, have less effect in preventing crimes
and amending the manners of a people than such as are
more merciful in general, yet properly intermixed with due
distinctions of severity.  It is the sentiment of an ingenious
writer, who seems to have well studied the springs of human
action (Beccaria) that crimes are more effectually prevented
by the certainty than by the severity of punishment.  For
the excessive severity of laws (says Montesquieu Sp. L. b.
6 C. B.) hinders their execution; when the punishment sur-
passes all measures the public will frequently, out of human-
ity, prefer immunity to it.  *  *  *.  It is a kind of quack-
ery in government and argues a want of solid skill, to apply
the same universal remedy, the *ultimum supplicium,* to every
case of difficulty.  It is, it must be owned, much easier to
extirpate than to amend mankind; yet that magistrate must
be esteemed both a weak and a cruel surgeon who cuts off
every limb which thru ignorance or indolence he will not
attempt to cure.  *  *  *  Where men see no distinction
made in the nature and gradations of punishment, the gener-
ality will be led to conclude there is no distinction in the
guilt."

It would seem to the writer of this opinion that if in
proceedings of this kind, courts would less frequently con-
fine their judgments to the alternative of a dismissal of the
proceeding on the one hand, or absolute disbarment on the
other, and should more generally exercise a wider use of

their discretionary power in the matter of corrective, better results would be obtained toward purifying the profession.

In view of the serious consequences of absolute disbarment, attorneys and bar associations hesitate to prefer charges against a fellow member of the bar, even though the welfare of the profession and of the public may demand it. And courts are likewise loth to inflict the extreme measure of corrective in the absence of the most convincing proof, and that only in case of flagrant violation of professional duty.

That courts have the inherent power of corrective, and that they may in the exercise of a wise discretion vary in degree as the circumstances of the case seem to justify, from rebuke to absolute disbarment, appears to be the uniform trend of judicial precedent.

The power to admit and remove, suspend or disbar attorneys has been held not to be the subject of statutory regulation, but is exclusive in the province of courts. *In re Thatcher,* 198 Fed. 969; *In re Simpson,* 9 N. D. 379, 83 N. W. 541; *The People v. Chamberlain,* 242 Ill. 260, 89 N. E. 994; *State v. Winter,* 11 Ore. 456, 5 Pac. 337. Such a proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. *Ex parte Wall,* 107 U. S. 265, 27 L. Ed. 552, 2 Sup. Ct. 569.

Mr. Justice Carter, of the Supreme Court of Illinois, in his recent work on The Ethics of the Legal Profession, has made the following observations which are well worthy of consideration by the courts and members of the profession:

"The relations of attorneys and judges are so closely interrelated that what affects the one necessarily affects the other and the judges cannot be too careful in proceedings of this character. Indeed, one of the leaders of the bar has recently insisted that the courts are too liable in these matters to judge without mercy; that the discipline is so

severe that when his conduct is questioned the lawyer is under a positive disadvantage in making his defense because of the sensitiveness displayed by judges in trying to maintain a high standard of professional conduct. No better guide on such questions as this can be taken than the rule laid down by Chief Justice Marshall in *Ex parte Burr,* where he stated:

'On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other hand it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised.'

The intention or motive that actuated the lawyer will necessarily weigh much with the court in reaching a decision as to any disciplinary methods that should be administered to one transgressing the ethics of the profession."

It was well said *In re Thatcher, supra:* "Removal from the bar, a position of honor, influence, and emolument, which has been attained only through much effort, is so severe a stroke that, even when the purity of legal proceedings is involved, a court confronting the unpleasant duty looks first to see if a corrective less drastic may not suffice. When the prosecution is based upon an isolated offense, unless the proved commission of a felony, it may be well to inquire whether circumstances not likely to recur, and for which, doubtless, repentance is manifested, may have been the occasion, in which case suspension, or perhaps direct reproof, only, may be a proper judgment. We are easily within bounds in the observation that hesitancy of courts and bar associations to apply the corrective of disbarment

has interfered with with the maintenance of the proper standard of professional ethics."

From a careful consideration of all the facts in this case, we are of the opinion that disbarment would be extreme, while at the same time the negligence of the respondent cannot be overlooked.

It would seem that in this case, suspension for a substantial period will sufficiently accomplish the purpose contemplated by this proceeding without completely destroying the respondent's future usefulness, or his ability to earn a livelihood.

It is, therefore, the judgment of the court that the respondent be, and is hereby, suspended from the right to practice the profession of the law in this state for a period of six months from this date, and it is so ordered.

*En banc.*

TELLER, J., dissenting.

Decided October 4, A. D. 1915.   Rehearing denied November 1, A. D. 1915.