THE PEOPLE *ex rel.* Jacob J. Ludens, State's Attorney, *et al.* Relators, *vs.* ARTHUR G. HARRIS, Respondent.

*Opinion filed April 20, 1916—Rehearing denied June 20, 1916.*

1. ATTORNEYS AT LAW—*what is not criminal offense.* An attorney who continues to take acknowledgments and administer oaths as a notary public for two periods of more than a year each after the expiration of his commission and before its renewal is guilty of great negligence, but in the absence of proof of willfulness on his part he cannot be said to be guilty of the criminal offense of falsely·assuming or pretending to be an officer.

2. SAME—*what conduct is highly unprofessional.* An attorney who collects money on claims sent to him for collection, uses the proceeds and falsely represents to his clients that the claims have not been paid, and who fails to pay over the money until after his clients have ascertained the facts and made demand upon him, is guilty of unprofessional conduct and is subject to discipline by the Supreme Court; but the fact that he has paid over the money to his clients may be considered and the respondent disciplined by suspension instead of disbarment.

3. SAME—*unfriendliness of relators is not material if facts are proved.* The unfriendliness of the relators to the respondent in a disbarment proceeding cannot affect the decision of the case if the facts alleged in the information are proved.

4. SAME—*power of Supreme Court to disbar an attorney is inherent.* The power of the Supreme Court to disbar an attorney is an inherent one, which exists independently of the statute, and the mere fact that an attorney has settled with his clients upon demand does not preclude the Supreme Court from disbarring or suspending him, where the proof shows concealment, misrepresentation and long delay before the settlements with clients were made.

DUNN and COOKE, JJ., dissenting.

ORIGINAL information to disbar.

JOHN L. FOGLE, and DIXON & DIXON, for relators.

GEO. J. DREISKE, and M. T. MOLONEY, for respondent.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Jacob J. Ludens, State's attorney of Whiteside county, and Robert Nelson and H. L. Dollahan, residents of Lee county, filed to the April term, 1914, of this court an information of eight counts, charging the respondent, Arthur G. Harris, of Lee county, with unprofessional and dishonorable conduct and praying that his license as an attorney at law be revoked and that his name be stricken from the roll of attorneys. Two additional counts were later filed and the information as amended was answered, and the issues thus formed were referred to Daniel H. Gregg as a commissioner to take and report the evidence and his conclusions thereon. Evidence was taken on all the counts, and the commissioner reported that the respondent was licensed to practice law by this court October 15, 1901, and set out the facts found by him under every count. His findings on the evidence are, in substance, that the information was not filed in good faith and for the purpose of maintaining the ethics of the legal profession but rather for the purpose of

settling private quarrels and political differences; that while
the respondent has been exceedingly careless and conducted
his business with respect to collections intrusted to him in
a loose and slip-shod manner, yet the evidence wholly fails
to show any conduct of the respondent indicating moral
turpitude, and he recommended that the information be dis-
missed.    The relators filed exceptions to the findings of
fact by the commissioner.

The main evidential facts set out by the commissioner
under every count of the information are substantially the
same in every particular as those averred in the information.
In fact, there is no dispute as to the real facts in this rec-
ord.    The real controversy is as to what conclusion should
be drawn from the evidential facts.

The first two counts of the information are based on
the conduct of respondent with reference to two claims or
accounts sent him for collection by Fairbanks, Morse & Co.
The evidence shows that respondent collected the first claim
of $71.19 by a check payable to his client for that sum, on
which he indorsed the name of his client and received the
full sum in cash on February 1, 1912.    On May 19, 1911,
he collected on the second claim of said client, which was
against Robert Nelson, one of the relators, the sum of $205
as part payment.    Almost three years after respondent had
collected the latter amount on the Nelson judgment his
client sent the claim to another attorney and then learned
for the first time that respondent had collected the $205.
Herbert J. Robins, the head of the credit department of
Fairbanks, Morse & Co., on March 4, 1914, visited respond-
ent at his office in Dixon and asked him how he was get-
ting along with the Nelson claim.    The respondent replied,
"Well, nothing doing yet, but I hope to get something soon."
Thereupon Robins showed him the canceled check for $205,
and then he admitted collecting that amount and also the
amount of the first (or Rutt) claim.    On being asked to
make a settlement of both claims respondent asked Robins

to return in an hour, and within that time he went to his bank and borrowed the money and returned and settled both claims in full for the sum of $250, the remainder being retained as his fees for the collections. Respondent had concealed from his client the fact that he had made the collections, by making false statements in letters to them and by failing to make report on said collections when requested. After frequent requests had been made for reports and ignored by respondent, on February 5, 1912, nearly a year after he had collected the Nelson claim, he wrote his client: "I expect to be able to collect some on the Nelson judgment soon, as have some matters tied up with him. The only danger is his going into bankruptcy in order to wipe out everything. In fact, he wants someone to put him through the bankrupt court." On May 24, 1913, he again wrote them: "In reference to Mr. Nelson, will say that he is doing a little business in his own name but it is hard to tell if he is paying any of his accounts or not, but I think that it is possible that we can catch him on some of his contracts. He has a great many accounts out against him. I have returned a number, but as soon as anything favorable develops will inform you." In like manner he had, after collecting the money on the Rutt claim, been requested frequently by his client to report progress of that collection and failed to make any response thereto until in October, 1913, twenty months after the collection, he wrote his client: "In reference to the Rutt matter of Sterling, I expect to have this adjusted very soon."

The third count charges, and the proof shows, that respondent neglected and failed to release the Nelson judgment until after demand was made on him to do so. It also charges that such neglect and failure did great injury to Nelson's credit, but the proof shows that his credit was injured, not by the respondent's failure to release the judgment but by his failure to pay over the money collected to Fairbanks, Morse & Co., as appears from the testimony of

W. J. Hintz, salesman for said company. It is rather un-
usual, we think, for attorneys to enter credits or partial sat-
isfactions on judgments for their clients before demand on
them when only partial payments thereon are made to them.
The $205 was only a partial payment of the Nelson judg-
ment. The proof under this count does not show such con-
duct of the respondent as justifies any penalty or censure
of this court, and the exceptions to the commissioner's find-
ings thereon are overruled.

The evidence under the fourth count is that respondent
received from William H. Winn, an attorney of Dixon, with
offices on the same floor and in the same building with re-
spondent, another claim against Robert Nelson in favor of
the Western Roofing and Supply Company. He collected
on said claim $71.23 in May, 1911, and failed to pay the
same over until March 5, 1914. At least on two different
occasions between said last two dates Winn asked respond-
ent if he had collected or had done anything in regard to
that collection, and respondent's answers were that he had
not collected anything on the claim. But immediately after
his settlement of the said two claims of Fairbanks, Morse
& Co. he called Winn into his office and admitted that he
had collected the claim of the Western Roofing and Supply
Company and asked Winn to accept it. Winn refused the
money because he had returned the claim, and then on said
date it was remitted to the company through another attor-
ney, a mutual friend of both Winn and respondent.

The proof under the fifth count is, in substance, that
the Springfield Collection Agency sent a claim to respond-
ent for $13.20 in favor of the Bijou Film and Amusement
Company against A. T. Manges; that he reduced the same
to judgment, which was paid to him December 9, 1910, and
neglected and refused to remit the money until January 9,
1912, and deceived his client by misrepresentations leading
them to believe he had not collected the claim. Frequent
demands were made on him for reports, and on two dates

273 – 27

they demanded a remittance of the money in case he had collected it. He ignored the following demand of his client written him April 22, 1911: "Can you not favor us with a remittance in the claim of Bijou Film and Amusement Company *vs*. Manges?" Not until after this claim had been forwarded to another attorney for collection did he remit the money, and then he simply inclosed it in an envelope after deducting his fee, without inclosing any letter with his check.

To sustain the sixth count it was proved that respondent received from Frederick Vose, an attorney of Chicago, a claim for $186.46 in favor of the Mills Electric Company against Dollahan & Co. He collected thereon, in January, 1913, three ten-dollar payments and then wrote Vose: "Enclosed find check for $10 on this account. He has promised to pay more soon." Failing to get any response to his frequent requests for reports from respondent, Vose made a demand direct on Dollahan & Co. and learned they had paid the respondent on the claim $40. When respondent's attention was called to his failure to remit all he had collected, he replied to Vose on June 28, 1913: "I have been away for nearly a week and find that Dollahan has paid $30. I notice, however, that it is not as he mentioned it. Enclosed find check for same on the electric company account."

The proof under the seventh count is that the respondent undertook to collect for and remit to Lewis Wald an account for $19 against Jacob A. Snyder. He settled the account with Snyder by taking a note for $22 signed by Snyder and his father, payable sixty days after May 5, 1911. They paid him the note in installments before it was due. He neglected and refused to write or to remit the money to Wald and ignored all requests from Wald for information about the collection until July, 1913. He was moved to remit it then by Wald employing a lawyer, H. A. Brooks, who made demand on respondent to pay the amount he had collected. Wald never knew the money was collected by re-

spondent until he made demand on Snyder after he could get no response from respondent.

The proof under the eighth count is that he received another claim for collection from Alfred E. Manning for $101.18 against M. L. Werner in favor of Otto Young & Co. He made collections thereon as follows: September 15, 1913, $25; November 19, 1913, $45; November 21, 1913, $37.50. His only replies to frequent and urgent requests for reports on this claim are as follows: On October 1, 1913, "Mr. Werner is sick at this time but I think collection can be had soon;" November 3, 1913, in response to a further inquiry he wrote he had collected $10 and forwarded that amount; on November 20, 1913, "Enclosed find check for $25 just collected on the Werner matter;" on December 19, 1913, he wrote and sent Manning a check for $15. He refused to answer further inquiries and neglected to remit the remainder of the money collected until February 17, 1914, and after the matter was taken up for adjustment through the national clearing house, of which association he was a bonded member, on the complaint of Manning to that association after he had found out that respondent had collected the money. Before Manning learned of the fact that respondent had collected this claim, he had sent respondent, in addition to numerous letters, two very urgent telegrams dated December 20, 1913, and January 27, 1914. The first telegram read: "Have constable enforce judgment immediately; do not take chances; clients anxious." The second read: "Report to-day or return claim; clients greatly dissatisfied."

The first additional count charges, and the proof shows, that the respondent on January 9, 1912, collected $40 for Dr. Shamel on an account of $79 and made no report or remittance thereof until Dr. Shamel's debtor made demand on him for an explanation as to why the payment had not been remitted, August 1, 1914. He paid the amount to Dr. Shamel on August 4, 1914, without retaining any fee.

This payment was made after respondent had filed his answer to the original information of eight counts. The record shows no demands for remittance or for reports on the collection by Dr. Shamel, but does show that the balance of the claim is still in respondent's hands for collection. This count does not charge a fraudulent conversion of the money by respondent. The contention of the relators that the commissioner erred in not finding that there was a fraudulent conversion by him of Dr. Shamel's money cannot be sustained and their exceptions to the findings of the commissioner on this count are overruled. The evidence under this count, however, may be considered on the question of the intent of respondent in the consideration of other counts,— *i. e.,* on the question whether or not his conduct shown by the proof under other counts indicates moral turpitude.

Under the second additional count the proof shows, as in that count charged, that respondent administered oaths to persons making affidavits and took acknowledgments to deeds and other instruments after the expiration and before the renewal of his commission as notary public. His first commission as notary public expired August 11, 1906, and was renewed on September 30, 1907. His second commission expired September 30, 1911, and was not renewed until February 21, 1913. Respondent admits that he administered oaths and took acknowledgments to various deeds and other instruments during the time from August 11, 1906, to September 30, 1907, and from September 30, 1911, to October 5, 1912, as charged in said count. Shortly after said last date his attention was called to the fact that his commission as notary had expired, and the proof fails to show that he did any further acts as a notary after that date without a commission authorizing him to do so. The proof further shows that he only charged a fee for his services as a notary in a few instances. The proof nevertheless shows very great negligence on his part in not being watchful and ascertaining that his commission had expired at the

times aforesaid. We do not think the evidence shows willfulness on the part of respondent in those matters and we are not able to say that the commissioner's findings on this count are not sustained by the evidence. This charge is a separate and distinct charge from the others in the information, and the evidence on the other counts does not in any way tend to sustain it. If this count contained the only charge against the respondent we would hardly feel justified in holding that he is proven guilty of the criminal offense of falsely assuming or pretending to be an officer. The commissioner's finding that respondent is not guilty of criminal conduct or criminal negligence under this count is sustained.

The charges in the first, second, fourth, fifth, sixth, seventh and eighth counts of the information are clearly sustained by the evidential facts above recited, the truth of which is in no way questioned by respondent, and which are also recited in the commissioner's report as the facts proved under those counts. It requires no extended argument to support our conclusion as to those counts. The facts proven lead inevitably to the conclusion that respondent purposely and falsely and repeatedly led his clients to believe that no moneys had been collected on their claims, when, in fact, he had collected and appropriated the same to his own use, and in some instances had to borrow money to pay them their money when they learned the true facts and made demands for immediate payment. It was his duty as an attorney at law to pay all moneys collected for his clients, less his proper charges for collecting the same, promptly and without unreasonable delay. The conduct of respondent cannot be explained away as unintentional and as the result of "a loose and slip-shod" business method, "in that he failed to keep books or any accurate record and trusted to his memory with respect to the details," as found by the commissioner. The finding, therefore, that the evidence wholly fails to show any conduct of the respondent

that in anywise tends to indicate moral turpitude or any desire on his part to profit by his appropriation of his clients' funds cannot be upheld and the relators' exception to such finding is sustained.

Respondent urges as a defense to the information that the State's attorney of Whiteside county is not a proper relator, as rule 40 of this court does not permit a State's attorney other than the State's attorney where the respondent resides to become a relator in disbarment proceedings. Said rule also permits aggrieved parties to appear as relators in such petitions provided the same be sworn to by them. (*People* v. *Story,* 265 Ill. 207.) Nelson and Dollahan were both aggrieved parties within the meaning of the rule, and the petition was verified by their oaths, as required by the rule. Waiving the question whether or not the State's attorney of Whiteside county was a proper relator in this proceeding, the mere fact that he appears as a relator cannot be interposed by respondent as a defense. The fact that the relations between the respondent and those instigating and aiding the prosecution of the information are unfriendly cannot affect the decision of the case in any way where the facts are proved. *People* v. *Phipps,* 261 Ill. 576.

It is also urged that respondent cannot be legally disbarred or suspended, under the statute, as an attorney because he settled with his clients immediately upon demand being made upon him by them and paid every cent he owed them. There were at least two demands made upon the respondent by his clients to remit the amount of the claim, or any amount in his hands, if he had collected any. These demands, while conditional on his having the money, were nevertheless demands, and they were not only refused, but his clients were given to understand that he had collected no money for them, when, in fact, he had and was deceitfully concealing that fact. The power of this court to disbar an attorney is an inherent one, which exists independ-

ently of the statute. This court has so held, and that a settlement with a client for money collected does not preclude subsequent inquiry into the moral and professional character of the attorney's acts. (*People* v. *Chamberlain,* 242 Ill. 260.) The matter of settlement and full payment by respondent of all said moneys collected by him after knowledge of his clients of such collections and further demands by them cannot be considered by us as sufficient justification for the fraud and deceit practiced by him upon his clients after making such collections. The evidence, however, when considered as a whole, does not seem to warrant the conclusion that the respondent intended to keep the said moneys of his clients and deprive them of them absolutely, and we are therefore disposed to consider that fact and the matter of settlement and payment as entitling him to some favorable consideration in entering judgment against him.

The respondent is suspended from practice as an attorney at law for two years and until he may be permitted to resume such practice by the further order of this court.

*Respondent suspended.*

DUNN and COOKE, JJ., dissenting:

The respondent has deliberately, repeatedly and systematically collected and retained his clients' money, ignoring requests for information, making false reports, and when evasions, equivocations and falsehoods have been exhausted he has paid the money. His acts were not careless but deliberate, and indicated a corrupt and dishonest purpose to keep his clients' money for his own use. They are inconsistent with the good moral character essential to a license to practice as an attorney at law. In our judgment the rule should be made absolute against the respondent.