## IN RE DISBARMENT OF H. H. DUNN.[1]

December 31, 1927.

No. 26,020.

**Proceeding for disbarment dismissed.**
  Evidence considered and *held* not to require disbarment.

  Attorney and Client, 6 C. J. p. 607 n. 90; p. 612 n. 51.

Proceeding for the disbarment of H. H. Dunn. Proceeding dismissed.

*Charles Loring,* for state board of law examiners.
*F. G. Sasse, Joseph Moonan,* and *A. T. Vollum,* for respondent.

PER CURIAM.

Proceeding for the disbarment of H. H. Dunn, a member of the bar of this state residing at Albert Lea. Hearing of the testimony was referred to Honorable Carroll A. Nye, one of the judges of the seventh judicial district, who reported the evidence and his findings. No recommendations were made.

The original accusation of the state board of law examiners made on December 7, 1926, charged Dunn, as attorney for Nellie Mae Sprague, with withholding and retaining and failing to account for certain personal property, including $900 in Liberty bonds, the proceeds of litigation. By an amended accusation dated January 20, 1927, Dunn was charged with failing to remit to one Olson and

[1]Reported in 217 N. W. 142.

converting to his own use moneys received on a verdict which he obtained for him.   The latter charge is not pressed, and no reason for making it appears.

The accusation necessary to be considered involves a lawsuit in which Mrs. Sprague was the plaintiff and T. V. Knatvold and W. G. Chamberlain as executors of the will of C. M. Hewitt, and the First Baptist Church of Albert Lea, were defendants.   The cause of action involved the tracing of funds for 20 years and establishing a trust into which they passed.   It is not necessary to go into details.   It is enough to say that the litigation involved a very considerable amount of labor and was of uncertain result.   Judge Meighen, who tried the case for the defendants, thought the chance of Mrs. Sprague's losing greater than winning by a large percentage, and that Dunn "got a very excellent result" for her.

The case was decided on April 8, 1926.   Mrs. Sprague's recovery was $2,350, the full amount asked.   Not long thereafter Dunn appropriated the Liberty bonds and interest to his own use, as found by the court, "under the claim that he was entitled to the same in payment of his attorney's fee in said action."   He claimed a contingent fee of 40 per cent of the recovery, and the amount of the Liberty bonds was less than the 40 per cent.   Mrs. Sprague denied that there was a contingent fee, and the court found that there was none.

Considerable correspondence followed between M. H. Sprague, the son of Mrs. Sprague, and Dunn in the summer of 1926.   Sprague was making demands for a settlement.   Dunn gave practically no attention to young Sprague.   On October 13, 1926, Sprague filed a complaint with the board of law examiners.   On October 16, 1926, Dunn mailed the securities other than the bonds to Mrs. Sprague. On October 16, 1926, the secretary of the board of law examiners wrote to Dunn.   On October 23, 1926, Dunn answered, explaining the matter in some detail, and saying that he was willing to submit the reasonableness of his fee "to any three lawyers in the southern part of the state, barring only two," or to take the matter up in any reasonable way; and on December 16, 1926, he suggested a hearing

with the board and said that after the facts were gone over he was "willing to abide by whatever you say is right."

The act of Dunn in making use of the Liberty bonds in payment of his fee, although they were not sufficient in amount to discharge what he claimed was the fee agreed upon, was wrong. His conduct in this respect is subject to censure. We do not justify it. He should have accounted. The only question is whether his wrong was so serious that disbarment or suspension should result.

During 1926 Mr. Dunn was sick. There is no controversy about it. Judge Nye so finds. He was nervous and excitable and in some financial trouble. But it is true, as Judge Nye says, that he could have done better with Mrs. Sprague than he did. But his state of health is a fact not to be overlooked.

We cannot think him particularly blamable for failing to send the securities to M. H. Sprague. He was not the agent of Mrs. Sprague to receive them. If Dunn had sent the securities to him and he had used or converted them, it is likely that Dunn would have been liable to Mrs. Sprague.

Nobody for a moment thinks, so far as we gather from the record, that Dunn ever had a thought of stealing, or of cheating or defrauding Mrs. Sprague. The evidence is that his reputation as a practitioner for 37 years in southern Minnesota was without criticism. No one disputes it. The opportunity was given. During this time he had been active in counsel and in practice. He may have made enemies. His disposition may have been at times irascible and disagreeable, and it was in 1926. But the outstanding fact is that Dunn had no thought to cheat or to defraud, and has not cheated or defrauded. Mrs. Sprague all the time has been thoroughly satisfied with the work which he did and the result which followed and with the fee he retained. The dispute as to whether the contract was on a contingent basis is not of controlling importance in this proceeding.

There was evidence from members of the bar of southern Minnesota attesting the good character of Mr. Dunn. This ought to be of some weight with us. When these men say that during his long career he has had the reputation of an honest man in his profes-

sional calling it ought not to go for nothing with us when we are considering whether he did such wrong as to merit disbarment because of the single act which we have narrated. An isolated wrongful act, and of only such are we given evidence, does not stand on the footing of a series of wrongful acts.

Some time, the date not precisely appearing, about 35 members of the bar of southern Minnesota, including three judges of the district court, petitioned the board and suggested that the proceeding be dismissed. This as we understand it was after Dunn had offered to do anything that might be deemed proper by a committee of members of the bar in the way of settling the controversy. We do not chide them. It was put in evidence rather informally. at the trial of this proceeding, but they did not put it in. They did not seek to influence the court in a pending proceeding. That would have been improper. Whether they should make the petition to the board was for them. We have not overlooked In re Stolen, —— Wis. ——, 214 N. W. 379, 216 N. W. 127.

The proceedings for disbarment are dismissed.

WILSON, C. J. (dissenting).

An examination of the record convinces me that the findings of the referee are well supported by the evidence, and in my judgment the case calls for discipline. My conception of a lawyer's duty to his client prevents my participation in the judicial approval now given to counsel's conduct. Indifference and disregard of common professional and business courtesy, to say nothing of a conversion of client's property, is the equivalent of bad faith. A lawyer is subject to discipline even though he does not steal. No client should ever have to call for the assistance of others to get a reasonably prompt accounting from his own lawyer. Jockeying for a settlement with the state board of law examiners is of no moment. Counsel's disposition of his client's Liberty bonds was inexcusable. Failure to report this unnecessary and unauthorized act was worse. I think such conduct shows bad faith; but in any event such conduct reflects upon the profession with the same acrimony as if accompanied by bad faith, and to the layman judicial approval thereof

will be like sunshine upon vinegar, making it ten times sourer. I cannot believe that the opinion will establish a permanent rule for professional conduct.

STONE, J. (dissenting).

I agree that the charge based upon the so-called Olson matter should result in an acquittal. I do not agree that there was no reason for pressing it.

Respondent's treatment of Mrs. Sprague is of such a nature that in my judgment it constitutes misconduct so serious that it cannot be overlooked, even upon the ground that for nearly 40 years the respondent has been distinguished, both in his profession and out of it, to a degree far beyond the average. On April 8, 1926, judgment was ordered in Mrs. Sprague's favor to the effect that she was the owner of the fund in controversy. One M. H. Sprague of Grafton, North Dakota, is the son of the plaintiff. Respondent, by a letter of April 8, 1926, promptly advised him of the favorable outcome, saying also that he did not know whether or not there would be an appeal, and promising finally to "keep you promptly advised as to any new developments." Mrs. Sprague, the client, was not a resident of Albert Lea, where respondent lives, and it does not appear that he had any correspondence at all with her, except for the final letter later referred to. Whatever authority the son, M. H. Sprague, may have had to act for his mother, respondent certainly assumed that it was proper enough to correspond with him and inform him of progress made. There was no appeal, and on April 21, 1926, the case was disposed of by a final stipulation of settlement, pursuant to which there was then turned over to respondent non-negotiable securities of the value of $1,541 and Liberty bonds of the par value of $900, with matured interest coupons aggregating $125.08, the total being $2,566.08.

April 23, 1926, without report to his client and without her consent, respondent appropriated to his own use the Liberty bonds and accrued interest, an aggregate of $1,025.08. It is found that respondent claimed that he was entitled to the bonds for his fee, but

that in fact "no bargain, agreement or contract with regard to fees was made between Nellie Mae Sprague or any one having authority to act for her and the respondent," except one implied from the fact of retainer, "to pay the reasonable value of respondent's services." The agreement which respondent claims is one alleged to have been made with Mr. T. V. Knatvold, who, respondent says, represented Mrs. Sprague in retaining him. Mr. Knatvold having in the meantime departed this life, there is no evidence of the alleged agreement other than that of respondent himself.

July 28, 1926, M. H. Sprague, writing for his mother, asked respondent to "send the notes, stocks and bonds either directly to her" or to a designated bank for delivery to her, together with a statement of account covering respondent's services. Mrs. Sprague was financially responsible and able to pay in money. Respondent ignored that letter. Again on August 11, M. H. Sprague wired respondent asking when he might expect an answer to his letter of July 28, which had been registered. On August 12, respondent replied, "Just as soon as I can dictate of course." True, respondent was somewhat incapacitated by sickness during the summer and fall of 1926, the finding being that he "was part of this time detained from his office on account of illness, but that said illness did not wholly prevent him from attending to his correspondence and other routine office business." He was in his office part of the time and attending to business there or elsewhere most of the summer. It is clear that during his absences his office was in charge of a competent stenographer, and it does not appear that she could not be depended upon to report what was going on and get off messages by letter or telegram even though respondent should give her nothing but the substance of the communication. Except for the implication in his telegram of August 12, that he would write "just as soon as I can dictate," he did not advise either Mrs. Sprague or her son that he was detained from his office by illness or otherwise. Anyway, he did not keep his promise to write M. H. Sprague as soon as he could dictate. He did not even reply to a courteous letter written by the judge before whom the case had been tried, advising him that M. H. Sprague was inquiring concerning the case

and asking him, respondent, to "kindly write Mr. Sprague." He neither answered the letter nor complied with that, its one request.

Respondent's inaction continuing, on September 20, M. H. Sprague, again expressly "acting on behalf" of his mother, requested an answer to his former letters and telegrams, threatening "drastic action," in default of an accounting, and, specifically, that a complaint would be filed against respondent. That letter was delivered to respondent's office September 22. Again he did not reply. October 11, M. H. Sprague called personally on respondent at Albert Lea and demanded the securities, respondent refusing the demand. October 13, M. H. Sprague made formal complaint to the board of law examiners. There may be no connection between the two events, but on October 16, 1926, respondent caused to be mailed to Mrs. Sprague her securities, other than the Liberty bonds. He simply told his stenographer to mail them, which she did without any letter of transmittal or statement of account. They were misdirected, and fortunately returned to respondent October 25, 1926. He then remailed them to Mrs. Sprague at Grafton, North Dakota, this time accompanying them by a letter which detailed the inclosures. It referred to his "letter to you of some days ago, enclosing" them, although there had been no such letter. This, his final communication with his client, was accompanied by no statement of account, *made no reference to fee or any claim that one had been agreed on, and was silent concerning the Liberty bonds and accrued interest.* At no time did respondent make any claim that he was entitled to 40 per cent of the recovery, pursuant to agreement or otherwise, to Mrs. Sprague, to her son, or to anyone acting for them or either of them. That claim did not appear until after the charges under consideration.

The referee found that the reasonable value of respondent's services did not exceed $500. For respondent it is claimed that he had in any event earned all or more than he retained. That issue is not for us, but it may be mentioned that, before the commencement of the suit Mrs. Sprague had been offered $1,800 in settlement. It may be doubted therefore whether respondent, in any view of the case aside from that of express agreement, would be entitled

to over $1,000 for bettering his client's condition only to the extent of about $750. The suggestion, in argument, that respondent's misconduct was such as to forfeit his right to compensation raises no issue for consideration here. See In re Disbarment of Buck, 171 Minn. 352, 214 N. W. 662.

It is urged that we should give respondent the benefit of the contingent fee agreement, which he claims was made, entitling him to 40 per cent of the recovery. The adverse finding is a stubborn obstacle. It is entitled to "the effect of a special verdict." G. S. 1923, § 9319. But in deference to the argument, so sincerely and persistently urged for respondent on this point, I have examined the evidence and must say that an opposite finding would be opposed to every trend of the record except alone the statement of respondent himself. The lawyer who has practiced so extensively as has respondent for nearly 40 years ordinarily does not appropriate to himself over $1,000 worth of his client's securities without telling her what he is doing and why; and if his action is based upon contract, it is explicitly made the basis of his action. Nowhere, through a correspondence extending over months, did respondent suggest a contract to justify his action. Worse than that, he did not tell his client or anyone representing her what he had done, and finally he attempted to close the matter without explanation. Respondent's silence, which so characterizes the res gestae, has grown into a significance vastly more than that of a mere negative circumstance. It has become an outstanding affirmative fact, persuasive if not conclusive, against the claim of a contract for 40 per cent of the recovery.

The foregoing discussion shows plainly that respondent was guilty of a conversion of the Liberty bonds. I do not overlook his attorney's retaining lien to secure his fee and disbursements. We may here indulge the assumption, impossible as fact, that respondent had a right to 40 per cent of the recovery. Allowing that, it remains that the client and not the attorney had the right to say how that fee should be paid. The securities were specific personal property belonging to the client. They were her property, and it was her right to take them upon paying respondent his fee and dis-

bursements. Of that right she was denied by the wrongful act of the attorney. In any view of the case, even his own, respondent has been guilty of misconduct to that extent.

Likewise and again even from his own standpoint, respondent has been guilty also of misconduct towards his client in failing to advise her promptly of the settlement of the case and his acquisition of the resulting fund for her account. He did not account promptly or at all. That itself is misconduct. In re Disbarment of Yakey, 170 Minn. 21, 212 N. W. 13.

Another argument for respondent is that his client, Mrs. Sprague, never complained of his action and does not now complain. There is a finding to that effect. I consider it immaterial. Given misconduct of an attorney, the court of which he is an officer is not much interested in learning that for some reason or other the client is satisfied to have been mistreated. The private relation between attorney and client is not the thing at issue. It is rather the relationship of the profession and the courts to the public which they serve. So the fact should be ignored that here the client is not the complaining party. It is not her interest that is being served by this prosecution. The power to discipline erring attorneys "cannot be made to depend upon the inclination to prosecute by the particular client who may happen to be the victim of an attorney's misconduct." People v. Chamberlain, 242 Ill. 260, 267, 89 N. E. 994, 996. See also In re Webb, 37 S. D. 509, 159 N. W. 107.

The respondent's previous high character makes for credibility and leniency. But, given the demonstration of flagrant misconduct which we have, it is a queer kind of justice which can here acquit because of previous good character alone and in another case (In re Disbarment of Yakey, 170 Minn. 21, 212 N. W. 13), for a much less serious offense, suspend for two years. Certainly if there is justice in the one case, there is grave injustice in the other.

I do not consider it a case for disbarment, but I cannot find, and I have diligently searched for, any reason for letting the respondent go with only the mild and inadequate censure with which the majority content themselves.