In the Matter of Disciplinary Proceedings against Neil S. MACKAY, an Attorney at Law.

No. ABA 8.

Supreme Court of Alaska.

Oct. 26, 1964.

On Rehearing Jan. 30, 1965.

Petition for Reconsideration Denied May 13, 1966.

Certiorari Denied, June 20, 1966.

See 86 S.Ct. 1907.

Petition for Rehearing of Denial of Certiorari Filed July 15, 1966.

Wendell P. Kay and Arthur D. Talbot, Anchorage, for respondent.

No appearance for Alaska Bar Ass'n.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The Alaska Bar Association commenced this disciplinary proceeding in 1961 by filing a complaint against the respondent, Neil S. Mackay, charging him with misconduct in his office as an attorney and counselor at law and with violating his oath as an attorney and counselor by cheating or over-reaching a client. The complaint was later amended by the addition of two more charges, namely, purchase by the respondent of an interest in a suit of his client and lack of candor be-

fore the court. All charges were denied by the respondent.

The matter came on for hearing in September 1961 before a trial committee composed of three attorney members of the Alaska Bar Association, both parties being represented by counsel. After the hearing, which required several days for the taking of testimony and the argument of counsel, the majority, that is, two members, of the trial committee made written report "that there were many elements brought out in the hearing which indicated deficiency in conduct on the part of the accused as over-reaching of the client." It was their recommendation that the respondent should be suspended "from the right to practice law in the state of Alaska for not more than six months as the Board of Governors feels appropriate." [1] The third member of the committee wrote a dissenting report in which he stated that he found nothing in the respondent's conduct toward his client which called for any disciplinary action.

1. With respect to the filing of complaints and the functions of the trial committee in disciplinary proceedings against attorneys at law, the Rules of Procedure Relative to Disbarment, promulgated by the Board of Governors pursuant to authority vested in it by section 8, chapter 196, SLA 1955 [Section 35-2-77h ACLA Cum.Supp. (1957)] provide as follows:

"Rule 7. PREPARATION AND FILING OF COMPLAINTS. If it shall appear to the President or other officer of the Board designated by the President, from report of the local grievance committee or otherwise, that grounds for reprimand, suspension or disbarment exist against any member or other attorney, such officer shall cause to be prepared and filed with the Secretary a complaint against the accused in the name of the Alaska Bar, and proceedings shall then be had thereon as hereafter provided. Such complaint shall be signed by the Secretary and shall set forth the acts or omissions of the accused so as to enable him to know the nature of the charges against him. Where more than one act or transaction is relied upon, the allegations shall be separately stated and numbered. The complaint need not be verified. Within the discretion of the Board, reprimand may be made by it without the filing of a formal complaint.

"Rule 8. TRIAL COMMITTEES. A trial committee, to be composed of three or more active members of the Alaska Bar, may be appointed by the President or other officer of the Board designated by the President for each city and vicinity mentioned. All cases of misconduct in which complaints are filed with the Secretary shall be tried by three or more members of the trial committee to be designated by the President or other officer of the Alaska Bar as may be designated by the President from time to time, one of whom shall be designated by the President to act as chairman of the particular trial committee so selected, provided that by resolution the Board may assign any such case to a special trial committee appointed by the Board. Members of the trial committee shall be selected for each case, and, whether chosen therefor by the President or the Board, such selection shall be made for the sole purpose of giving the accused a fair and impartial trial and to insure justice to the public. A trial committee shall be appointed for each specific case. By vote of the Board, they or any of them, may be removed at any time and their successors appointed to serve. Members of the local grievance committee shall not sit as members of any trial committee concerning any case as to which such member or members may have made any investigation.

"Rule 9. DUTIES OF TRIAL COMMITTEES. It shall be the duty of trial committees to whom complaints have been referred promptly to settle the necessary pleadings in each case and try the same in the manner hereinafter provided. They shall pass on all questions of procedure and admission of evidence, and, in case of disagreement, the majority of the members of the trial committee shall decide each point or objection. They shall keep a record of all proceedings, including a transcript of the evidence and exhibits offered and received, and shall promptly transmit such record to the Board with their recommendations by forwarding the same to the Secretary. The recommendations to be made by the trial committee shall be by majority vote."

The Rules of Procedure from which the foregoing excerpts were taken were superseded on June 1, 1964, by "Rules of the Alaska Bar Association" promulgated by this court.

The minutes of the Board meeting of November 30 and December 1, 1961, deserve particular consideration and comment. As one of the last items of business on November 30, 1961, the Board unanimously voted to hear counsel for Mr. Mackay "informally as a courtesy extended by the Board."

The minutes reveal that the Board was called to order by the president at 9:30 a. m., Friday, December 1, 1961. Roll call showed eight members present, including the president. Counsel for Mr. Mackay appeared and spoke with respect to the grievance matter. Following the departure of counsel it was moved and seconded that the Board "sustain or concur in the dissenting opinion of the Trial Committee."[2] The motion was declared carried. The recorded vote named four members who voted "yes" and two who voted "no." Unexplained in the minutes is the failure of the president to vote on the motion although he was present and chairman of the meeting. Also unexplained in the minutes is the fact that a member was permitted to abstain from voting on the motion.

A statute in effect at the time the trial committee and the Board acted in this matter provided in part:

"Upon finally determining any cause involving the discipline, disbarment, suspension or reinstatement of a member of the Alaska Bar, the Board of Governors *shall certify its findings and recommendations thereon to the Supreme Court of Alaska.* Upon receiving the findings and recommendations,

the Court shall, within thirty days thereafter, issue an order of disbarment, suspension,. reinstatement, dismissal or otherwise, in full accordance with the recommendations of the Board * * *." [Emphasis supplied.][3]

The certification to the supreme court of the Board's findings and recommendations, as required by the above quoted statute, was never made. If this court had not had occasion only recently to remove the Board of Governors for refusal to comply with the court's rules and take temporary custody of the Association's records, it is doubtful if the court would ever have learned of this case.

We pause at this point to express disapproval of the failure of the president and another member of the Board to vote on the motion when it was their duty to do so. Only the most compelling of reasons could justify abstention under the circumstances and in such case the minutes should reflect the reason. Before abstaining the consent of a majority of the members present should have been obtained by a request and a formal vote on the request.

We are seriously concerned over the failure of the president and the members of the Board to certify or cause to be certified to the supreme court their findings and recommendation. Instead of certification as required by law, the Board apparently entered an order dismissing the complaint and destroyed all of the records of the case including the transcript of the trial proceedings.[4]

---

2. Rule 37 of the Rules of Procedure mentioned in note 1 above provided that
"The findings of a trial committee shall be reviewed by the Board [of Governors] upon (1) the record made and transmitted to the Secretary, (2) the statement, if any, in support of, or in opposition to, the recommendations of the trial committee, and (3) such additional evidence as may be received by the Board. Prompt decision upon such review shall be made by the Board and the Board's decision and recommendation shall be re-

ported to the District Court for the District of Alaska and a copy thereof, as required by Section 14 of the Alaska Bar Act, notice thereof, shall be given to the accused."

3. Section 35-2-77n ACLA Cum.Supp. (1957) as amended by SLA 1960, ch. 178, § 6.

4. In response to verbal inquiry as to why certification was not made in this case, the former executive secretary advised that the entire record in this case was

We turn our attention next to that portion of the above quoted statute which states:

"Upon receiving the findings and recommendations, the Court shall, within thirty days thereafter, issue an order of disbarment, suspension, reinstatement, dismissal, or otherwise, *in full accordance with the recommendations of the Board* * * *." [Emphasis ours.]

■ As of December 1961, when the Board should have certified its findings and recommendation to this court, the above statute was in force. We hold, however, that insofar as it attempted to impose upon the court the mandatory duty of issuing an order in full accordance with the recommendation of the Board, it was unconstitutional for being an invasion of the inherent power of the court to discipline and disbar members of the Alaska Bar Association.[5]

The above statute has been superseded by Rule 9, sections 13 and 14 of the Alaska Bar Rules, promulgated by this court effective June 1, 1964, which state:

"Section 13. Review. All reviews shall be on the record unless the Court, in its discretion, grants a hearing de novo, in whole or in part. Following review, the Court shall enter a final order disposing of the matter as it sees fit.

"Section 14. Procedure When Uncontested. If no petition for review is made within the time limited, the Court may issue an order of dismissal, repri-

mand, disbarment, suspension, or order review on its own motion, as it sees fit."

The case was not processed and moved along by the Board with the promptness it deserved as a disciplinary proceeding. This is evidenced in the following paragraphs contained in a letter written in connection with this case by the chairman of the trial committee to the president of the Board:

"I would be less than honorable in this situation if I did not at this time call to your attention several points of concern that have rather plagued the writer as a committee member throughout the course of this proceeding.

" * * * The delay in bringing this matter to hearing is almost unconscionable and while some of it may be the fault of the chairman of the committee, certainly the hearing was long delayed by virtue of failure to constitute a trial committee. This matter should have been gotten out of the way during the year of 1960 and accordingly is at least one year late of what it should have been. This I think is inexcusable regardless of whose fault it is.

* * * * * *

"It appears to me further that the filing of the pleadings in this case was most haphazard. I would call your attention to the fact that we do not have all of the original pleadings. The original complaint is not in the file and we used a copy thereof. The items in the file when we received it, were not date stamped as to receipt and the whole aspect of filing seemed most casual.

in the possession of the Board and that it was their obligation to certify, not his. Inquiry of the then president elicited the comment that he believed that, since the case was disposed of in favor of the accused, the records were all destroyed. The court succeeded in obtaining copies of the pleadings from a member of the trial committee and a transcript of the testimony from the court reporter.

5. See In re Sullivan, 64 Ariz. 337, 170 P. 2d 614, 615 (1946); In re Accusation by Walker, 32 Cal.2d 488, 196 P.2d 882 (1948); Martin v. Davis, 187 Kan. 473, 357 P.2d 782, 787–788 (1960), appeal on other point dismissed sub nom. Martin v. Walton, 368 U.S. 25, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961); In re Farris, 229 Or. 209, 367 P.2d 387, 397 (1961); Ruckenbrod v. Mullins, 102 Utah 548, 133 P.2d 325, 330, 144 A.L.R. 839 (1943).

"It appears to me that after the trial committee was appointed that there was no follow-up on the part of the Board of Governors. I would appreciate the fact that the Board of Governors did not find fit to concern themselves or to inquire as to the timing of the proceedings, leaving it entirely in the hands of the chairman of the trial committee, if such was intended as an expression of confidence.

"I am reasonably certain that there was no expression of confidence by this failure to inquire or to follow the pleadings and I can assure the Board that if the same procedure is followed in the future you will have continued bad results. If we know anything we know there is an occupational disease of lawyers that distasteful matters are placed to one side, put off to another day and that is exactly what you can expect in situations of this kind. It would be my recommendation that the secretary upon the receipt of a file of this kind, set up a regular schedule to be followed by the trial committee and that a report be regularly made to the President so that the President of the Board will at all times know the timing and the stages of the proceedings of any disciplinary matter and a rule should be established that each and every one of them must be completed within a given time unless leave is granted for an enlargement of time from the Board."

 Though not required to do so because of this court's inherent power to discipline members of the bar,[6] we may

have felt constrained to adopt the recommendations of the Board if the trial committee had reached a unanimous conclusion that disciplinary action was not called for and the Board had then unanimously affirmed that decision. Instead, there was no unanimity in the recommendation of the six members of the Board who voted and the decision they affirmed was not even that reached by the majority of the trial committee. In such a situation we feel it incumbent upon us to most carefully examine the law and the facts pertaining to the complaint against the respondent and to exercise our independent judgment in the matter. To do this we are in no less favorable position than was the Board of Governors, since it reviewed the case solely on the record as we shall likewise do.

Before proceeding with our review on the merits, we need to rule upon two motions filed in this court by the respondent. The first motion was filed on September 24, 1964, the same day on which the respondent and his attorney appeared personally before the court and the attorney made oral argument on behalf of the respondent. The motion was to dismiss the pending review of the disciplinary proceeding involving the respondent and was made on grounds of res adjudicata, double jeopardy and absence of a complete record upon which to base a fair and adequate review.

The second motion, designated "Supplemental Motion to Dismiss" was filed on October 9, 1964. It is based on claims of res adjudicata, laches or "stale mate," failure to bring the matter properly before this court and to advise the respondent of the charges against him and of the basis upon

6. See In re Paul, 17 Alaska 360, 366–368 (D.Alaska 1957); In re Tribble, 94 Ariz. 129, 382 P.2d 237 (1963); In re Hallinan, 43 Cal.2d 243, 272 P.2d 768, 774–775 (1954); In re Cox, 164 Kan. 160, 188 P.2d 652, 655 (1948); In re Platz, 60 Nev. 296, 108 P.2d 858, 861 (1940); In re Farris, 229 Or. 209, 367 P.2d 387, 392, 397 (1961); In re Olson, 116 Wash. 186, 198 P. 742 (1921), holding that the supreme court may, at its own option, examine into charges against an attorney proceeded against by the state board of bar examiners, even though the board has not recommended that his license be revoked or annulled, the court having inherent power to admit, suspend or disbar attorneys at law and notwithstanding statutory provision giving an attorney whose license has been revoked the right to petition the supreme court to review the board's findings.

which the court is proceeding, lack of jurisdiction in the court, no right in this court to review anything but the limited record upon which the minority of the trial committee found that the proceeding should be dismissed, and denial to the defendant of due process of law as prescribed in the state and federal constitutions.

The respondent was granted time until October 19, 1964, to file a memorandum or brief in support of his motions. The memorandum has been received and considered. We find no merit in the motions or in the reasons given in support thereof. Both motions are therefore denied and it is so ordered.

The facts leading up to the filing of the complaint against the respondent were as follows:

After completing law school in 1951 in California the respondent came to Anchorage, Alaska, where he went to work in the First National Bank and became a vice president in charge of loans. By virtue of his office he had numerous business contacts with one Mary Hill who with her husband, John Hill, had substantial cash deposits in the bank. It is to be noted that Mary Hill was a Finnish woman, sixty-eight years of age in 1957, who had no schooling, a very limited knowledge and use of the English language and not much business intelligence. The respondent described her as a spendthrift in the most exaggerated sense of the word and ventured to say that she would have signed anything he asked her to sign and that, if a Finn or anyone whom she knew quite well needed some money, she would give it to him.

Mary often co-signed promissory notes for persons borrowing money from the bank. On occasions when the bank notified her that payments on a note were delinquent and she volunteered to pay off the note, the respondent would assist her to force payment from the principal debtor. Eventually he persuaded her to stop co-signing notes. During the first several years of his acquaintanceship with Mary, the respondent observed that she and her husband, John Hill, completely dissipated a cash fund of $80,000.

The respondent was admitted to the practice of law in Alaska in March of 1955, after passing the bar examination here. In the meantime he had terminated his employment at the bank and gone into the undertaking business, combining this with some law practice after his admission to the bar. It appears that the respondent as a mortician conducted the funeral arrangements for Mr. Hill and thereafter acted as Mary's attorney until some time in 1960.

Among Mary's assets after the death of John Hill were two city lots with the improvements thereon located at Fifth Avenue and Gambell Street, adjacent to the Westward Inn and other business properties. The improvements consisted of several substandard rental units occupied for the most part by Mary's Finnish friends, some of whom were not paying their rent.

To digress for a moment, in 1956, after John Hill's death, Mary and another Finn, Herman Keno, whom she had known since 1940, obtained a license at Seward to marry; however, the marriage did not materialize until March of the following year. The respondent regarded this man as a very unpredictable person from about the first time he met him. Seven or eight times he had to bail Herman out of jail and pay his fine.

It seems to have become apparent to Mary quite soon after Mr. Hill's death that the operation of the Gambell Street property was not a profitable business for her because she was having trouble in collecting rent from the tenants and in paying the utility bills, taxes and costs of maintenance and repairs. Besides, she and Herman wanted to leave Anchorage and reside at Anchor Point. So Mary asked the respondent to sell the Gambell Street property for her. This he tried to do but without success. After Mary and Herman had made many calls at the respondent's office to inquire whether a buyer had been found, it was finally arranged that the respondent and his wife would purchase the property from

Mary for $1,000 plus payments of $150 per month during the remainder of her natural life. The respondent testified that the idea for the sale and its terms originated with Mary. There is no clear evidence to the contrary in the testimony of either Mary or Herman. In fact they both testified that they understood the deal and considered it a good one for Mary.

In regard to the value of the property, Mary and Herman felt that it was worth $40,000, but the respondent stated that he was unable to find a buyer at that price or at any price. Exactly what efforts were made by the respondent to push the sale of the property we are unable to determine from the record other than that he discussed the property with certain individuals who, he thought, might be interested in buying it, and he also listed it with a real estate firm. The respondent testified that he figured the property to be worth about $15,000; however, he did bind himself to pay for it some $31,000 in the event Mary lived out her life expectancy, according to the calculations given to the trial committee by his attorney. In 1958 the City of Anchorage gave the property an assessment value of $29,400, of which amount $17,450 was assigned to the land and the balance to the improvements. The respondent considered the evaluation placed on the improvements as being too high but he did not make any formal protest to the City.

The transaction was embodied in a formal written contract, along with deeds from Mary and Herman to the respondent and his wife, under date of January 9, 1957. The conveyance from Herman was in the form of a quitclaim deed and was obtained by the respondent to safeguard against any marital claims that Herman might have to the property. The respondent took Mary and Herman to the office of another attorney, Albert Maffei, before whom the subject documents were executed and acknowledged.

The respondent testified that Maffei was brought into the picture as independent legal counsel for Mary and Herman. Maffei testified that he was not hired or paid by the Kenos (Mary and Herman) to act as their attorney on this occasion. His function, as he understood it:

"was merely to act as a person that would—an independent person that would explain to these individuals the nature of these—not the nature of these documents, but the substance of them. In other words, I was to read it over with them so that they would know what they were signing. I think mainly I was to act as the notary."

The record does not establish that Maffei acted as independent legal counsel for Mary in this transaction.

The written agreement between Mary and the Mackays contained two patent irregularities. It bore no legal description of the property to be transferred, referring to it merely as "one full lot and one-half lot" in the Anchorage Recording Precinct, and it had this unusual penultimate paragraph:

"That should the parties of the first part [the Mackays] predecease the party of the second part [Mary Hill Keno], said heirs or assigns of the parties of the first part *shall have the right to fulfill and carry out this agreement* pursuant to the terms hereinabove set forth." [Emphasis supplied.]

If Mr. Maffei had been acting as counsel for Mary, it is reasonable to assume that he would have raised some question about these irregularities present in the document. Instead, he testified quite definitely that he did not advise her regarding either of these matters; nor did he discuss mortality tables with her or ascertain the wisdom of having her sign the agreement. This seems to us to be consistent with his statement that he was not her attorney.

After the transfer of the property, Mary received her payments of $150 per month regularly from the respondent, frequently drawing them in advance herself or by Herman. In June of 1958 without any apparent effort on his part, the respondent sold the property to the Alaska National

Bank for $25,000 cash, with a net sales return of $23,000 or $24,000.

At this point we note that Mackay was acting as attorney for Mary in foreclosing a real mortgage given by Arne Murto to Mary and her former husband, John Hill, to secure a note in the principal sum of $3,400. The full principal was in arrears, plus accrued interest. The First National Bank, by whom the respondent had earlier been employed, also had a mortgage on the property described in the mortgage held by the Hills. The bank's mortgage, though prior in time, had not been recorded in the recording office until after Hills had recorded their mortgage. There was some sort of understanding between the respondent and counsel for the bank that the bank would try to satisfy its claims against Murto first out of some other Murto property as to which it was the mortgagee, failing this, any losses sustained would be shared by Mary and the bank in proportion to the amount of principal and interest owed to each.

By 1959 it appears that Herman was exerting considerable force and effect upon the affairs of Mary. According to Mary's testimony, Herman wanted to cash out with the Mackays the agreement of January 9, 1957, so that he and Mary could go to Finland to live. Mary was opposed to the idea. The respondent corroborates Mary to the extent of saying that it was Herman who actually wanted a cash settlement of the agreement, but he insisted that he tried to dissuade Mary from surrendering her agreement. Finally, one day Mary and Herman came together to the respondent's office, so he testified, and said they wanted the cash settlement and that for $10,000 they would surrender the agreement of 1957 and throw in the Murto mortgage to boot.

Some time prior to these negotiations for a cash settlement, the respondent began having "problems with the Grievance Committee," as he put it, because someone had filed a complaint against him concerning the transaction of January 9, 1957. Just what effect that had upon the respondent's next move is uncertain but he did testify:

"Mary to this date, denies that she signed the complaint [with the grievance committee]. And of course, she probably signed a complaint, so therefore, I was rather dubious about the whole transaction, relative to who was doing what to whom. So when both of them came into my office and wanted $10,000 I went out and borrowed the money and gave it to them."

To formalize this cash settlement, the respondent followed practically the same procedure as in the 1957 transaction. He executed or caused to be executed a "Release of All Claims" by Mary and Herman of the 1957 annuity agreement for a lump sum settlement of $10,000 and an assignment by Mary to himself of the Murto note and mortgage. He then took Mary again before Mr. Maffei, ostensibly for the purpose of providing her with independent counsel in the matter. By this time he seems to have been associated with Mr. Maffei in real estate transactions and by some unexplained coincidence the release and the assignment appear on Maffei's stationery as an attorney at law. Maffei stated that the documents could have been prepared either in his office "or they could possibly have been dictated to someone in Neil's office." He maintained, however, that he acted in the same capacity on this occasion as he had in 1957—as a notary public in ascertaining that Mary and Herman knew what they were signing and then taking their acknowledgements. He received no compensation for his services either from Mary or the respondent.

It is the testimony of the respondent that he did not suggest that the Murto note and mortgage be made a part of the consideration for the $10,000 cash payment to Mary; nevertheless, the note and mortgage were incorporated in the release transaction. The respondent subsequently assigned his interest in the note and mortgage to one Martin, a very good friend and client of his for $2,000. Martin testified that the respondent stated to him at the time that he, Martin, would be able to double his money

"over an extended period of time, if everything went as it looked like it should."

At this point we have a situation in which the respondent, if we use his own figures, has made a net gain of $5,500 [7] from his dealings with his client Mary Hill Keno over her Gambell Street property. In addition to that he has received $2,000 from his assignment of the Murto note and mortgage, which he told the assignee might well be worth $4,000 in time. Thus, from all of his dealings with Mary and her property, the respondent has enriched himself in the amount of at least $7,500 over a period of less than three years, not to mention the legal fees he had received for services performed as an attorney at law for Mary and Herman.

Considering the evidence in this case as a whole and viewing in their entirety all of the acts of the respondent in relation to his client Mary Hill Keno, we are persuaded to agree with the majority of the trial committee that Mary had been over-reached, to use the milder expression, by the man on whom she relied for guidance and direction.

The respondent stated himself that Mary came to him because she relied upon him. Yet when Herman came to him with the offer to sell Mary's lifetime security for $10,000, and Mary later joined in the offer, the respondent took no firm stand against separating his client from "the protective devices he claimed to have initiated for her benefit," to use some of the language employed in the majority report of the trial committee. Even if we were to believe his testimony, as against that of Mr. Maffei, that he sent her to Maffei for independent legal advice,[8] it could have been only a token gesture, for neither he nor Mr. Maffei informed Mary that the respondent would be netting $5,500 for himself through this 1959 deal by virtue of his 1958 sale of the Gambell Street property to the Alaska National Bank. We cannot understand why under the circumstances he did not at least say to Mary: "You don't have to throw in the Murto note and mortgage, and I won't take them, because you have been more than generous in making it possible for me to already clear $5,500 on this deal," or words to that effect.

In strange contrast to the respondent's statement on the witness stand that he "felt very bad about the way she [Mary] broke down here the other day" and that he "would be more than happy to continue that $150 a month," is the fact that he has done nothing to make things right with Mary and apparently feels that he has done nothing unbecoming an attorney and one standing in the highly fiduciary relationship in which he stood with respect to his client.

We are of the firm opinion that the respondent, Neil S. Mackay, has manifested by his conduct in his dealings with his client, Mary Hill Keno, complete lack of comprehension or appreciation of the duties and responsibilities resting upon one in his position and as a member of the legal profession. We find him unfit to continue

---

7. From the sale price of $25,000 which the respondent received for the Gambell Street property, he credits himself for the following deductions: $1,000 paid to Mary in cash on January 9, 1957; $4,-950 paid to Mary in thirty-three monthly sums of $150 between January 9, 1957, and November 3, 1959; $10,000 paid to Mary in cash on November 3, 1959; $1,-500 as net loss from operation of the property by the Mackays between January 9, 1957, and the date of the sale of the property to the Alaska National Bank in 1958; and $2,000 for expenses of the sale; or a total of $19,450. The difference between the deductions claimed, roughly $19,500, and the $25,000 received from the sale is $5,500.

8. It is difficult to determine from the respondent's testimony whether he sent Mary to Mr. Maffei for independent legal advice. At one time in his testimony he said that was his intention and at another time, when asked how he could justify taking away from her the agreement by which she was receiving $150 per month, he answered: "Because that is what she wanted, and I talked her out of it, I don't know how many times. * * *"

as a member of the profession and as an officer of the courts of Alaska. The facts being as they were in this case, we feel that the six-month suspension recommended by the trial committee is entirely inadequate and that the misconduct of the respondent calls for his disbarment.[9] We, therefore, order that he be disbarred and that his name be stricken from the roll of attorneys of the State of Alaska, effective thirty days after the filing of this opinion.

So ordered.

### On Petition for Rehearing.

Neil S. Mackay, respondent in the above entitled disciplinary proceeding wherein he was disbarred from the practice of law by this court, has petitioned for a rehearing on nine separate grounds. The respondent's brief does not deal with these grounds in any detail and ignores some of them en-

9. See In re Park, 45 Wash.2d 383, 274 P.2d 1006 (1954), in which the court ordered disbarment of an attorney in spite of the fact that the Board of Governors, Washington State Bar Association, had recommended only a ninety-day suspension from the practice of law. The court answered in the negative the test question taken from an earlier Washington case: "Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney?"

1. The following six out of the nine grounds stated by the respondent in support of his petition for rehearing are considered by the court in this opinion:

1. The court misconceived its authority in assuming jurisdiction to act in an attorney disciplinary matter which has been reserved by statute to the administrative tribunals of the Alaska Bar Association.

2. The court has overlooked the fact that it is objectively disqualified to give the respondent a fair and impartial hearing, inasmuch as there is presently pending a controversy between this court and the Alaska Bar Association (of which the respondent is a member and of which controversy he is a party litigant) in the federal district court over the question of whether this court has the authority to establish the procedure for and con-

tirely. However, we shall discuss the six grounds which we deem to have sufficient merit to warrant our consideration. These are set forth in the margin, in paraphrase but under the numbers used by the respondent.[1] We shall commence with grounds numbered one, five and seven; and, since they are more or less related in that they all challenge the jurisdiction of this court to act in the matter, we shall consider them together.

The substance of the respondent's argument on the issue of jurisdiction is that the law applicable to this proceeding and in effect in 1961 when the trial committee and the Board of Governors of the Alaska Bar Association acted in this matter, which culminated in the exoneration of the respondent by the Board, was the Alaska Integrated Bar Act of 1955 [2] and the Rules promulgated thereunder by the Board. The

clude disciplinary proceedings against an attorney.

5. The court has exceeded its jurisdiction in that it is a court of appellate jurisdiction and without any original jurisdiction to hear an attorney disciplinary proceeding.

7. In holding that the rules promulgated for the Alaska Bar Association by this court, effective June 1, 1964, superseded the Alaska Integrated Bar Act of 1955 (SLA 1955, ch. 196), as preserved by section 8(d) of the Alaska Statehood Act (72 Stat. 339), the court has erroneously assumed the power to enlarge its own jurisdiction so as to include a right to prosecute respondent for an alleged offense of which he had been duly acquitted three years previously by the Board of Governors of the Alaska Bar Association, the only appropriate tribunal of competent jurisdiction.

8. The court has overlooked the circumstance that in retrying the respondent on a charge of which he had been earlier tried and exonerated it had subjected him to double jeopardy and violated the doctrine of res judicata.

9. The penalty of disbarment meted out to the respondent by the court was too severe under the circumstances of the case.

2. SLA 1955, ch. 196 [§§ 35-2-77a through 35-2-77o, ACLA Cum.Supp.(1957), now AS 08.08].

respondent contends that under that act only the trial committee and the Board of Governors had jurisdiction to prosecute him for the alleged offense of misconduct as an attorney, and that the Board's decision in the matter was final. He apparently bases his contention upon those provisions of the 1955 act which declare that the Board of Governors shall have the power·

"to investigate, prosecute, hear and finally determine all causes involving discipline, disbarment, suspension or reinstatement; and to prescribe rules establishing the procedure for the investigation and· hearing of such matters, and establishing divisional or municipal agencies to assist therein to the extent provided by such rules. * * *"[3]

and that

"Upon finally determining any cause involving the discipline, disbarment, suspension or reinstatement of a member of the Alaska Bar, the Board of Governors shall certify its findings and recommendations thereon to the Supreme Court of Alaska. Upon receiving the findings and recommendations,· the Court shall, within thirty days thereafter, issue an order of disbarment, suspension, reinstatement, dismissal, or otherwise, in full accordance with the recommendations of the Board of Governors, unless the accused member shall sooner petition the Court for review * * *."[4]

It is the further contention of the respondent that the Alaska Integrated Bar Act of 1955 continues in full force and effect down to the present time by virtue of section 8(d) of the Alaska Statehood Act of 1958 (72 Stat. 339, 344), which reads:

"Upon admission of the State of Alaska into the Union as herein provided, all of the Territorial laws then in force in the Territory of Alaska shall be and continue in full force and effect throughout said State except as modified or changed by this Act, or by the constitution of the State, or as thereafter modified or changed by the legislature of the State. * * *"

Upon the premise that the bar Act of 1955 is still in full force and effect by virtue of the foregoing provision of the Alaska Statehood Act, the respondent concludes that he is entitled to be tried and adjudged for alleged misconduct under the provision of the Bar Act alone, and that this court has no jurisdiction in the matter except at the appellate level and then only if the respondent had seen fit to ask for review.[5] To hold otherwise, says the respondent, would be to deprive him of his right to due process of law and equal protection of the laws under the fourteenth amendment of the Constitution of the United States [6] and Article I of the Alaska Constitution.[7]

 We cannot assent to the respondent's view, for to do so we would have to deny the inherent power of this

---

3. SLA 1955, ch. 196, § 8 [§ 35–2–77h, ACLA Cum.Supp. (1957), now AS 08.08.‑110(4)].

4. SLA 1955, ch. 196, § 14, as amended by SLA 1960, ch. 178, § 6 [now AS 08.08.220].

5. It stands to reason that the respondent would not have sought review by the court in this case, since the majority of the Board of Governors had voted to concur in the minority report of the trial committee that the respondent's ·conduct did not call for any disciplinary action.

6. "[N]or shall any state deprive any person of life, liberty, or property, without due process. of law; nor deny to any person within its jurisdiction the equal protection of the laws." Amendments to the Constitution, Art. XIV, § 1.

7. Excerpts from Article I of the Alaska Constitution:
 "Section 1. This constitution is dedicated to the principles * * * that all persons are equal and entitled to equal rights, opportunities and protection under the law * * *."
 "Section 7. No person shall be deprived of life, liberty, or property, without due process of law. * * *"

court over the suspension and disbarment of the attorneys.[8] The power of the courts to suspend or disbar has long been recognized in other jurisdictions.[9] It cannot be defeated by the legislative branch of government.[10] We accept the doctrine that an appellate court has such inherent power [11] and that it may exercise the power on its own motion.[12]

The exercise by this court in the instant case of the power to discipline the respondent is in keeping with the foregoing legal principles and it does not contravene any of the provisions of either the federal or state constitution.[13] We do not agree with the respondent's contention that there should be read into section 8(d) of the Alaska Statehood Act an intent to limit the powers of the Supreme Court of Alaska. We are convinced that any attempt by Congress to limit the power of this court, as the respondent contends, would be invalid. The Supreme Court of the United States has stated clearly on several occasions that states are admitted into the Union on an equal footing with respect to power, dignity and authority.[14] Applying that principle to the case under consideration, we hold that Congress cannot limit this court's power to discipline Alaskan lawyers either directly or by continuing in force the provision of a territorial statute claimed by the respondent to have that effect.

As to the respondent's assertion that this court is objectively disqualified to give him a fair and impartial hearing because it is biased or prejudiced against him on account of his participation in the pending federal court case mentioned earlier, we disclaim any such hostile feeling or spirit of ill will towards the respondent as would render us unfit to judge his case.[15] The fact that we may have an opinion as to the merits of the case or how it should be decided different from that of the respondent is not enough to make us biased or prejudiced.[16]

8. For only a few of the many cases recognizing the inherent power of the courts to discipline attorneys, see Phipps v. Wilson, 186 F.2d 748, 751 (7th Cir. 1951); In re Hallinan, 43 Cal.2d 243, 272 P.2d 768, 775 (1954); In re Trask, 46 Hawaii 404, 380 P.2d 751, 758 (1963); In re Watson, 71 Nev. 227, 286 P.2d 254, 53 A.L.R.2d 301 (1955); In re Bruen, 102 Wash. 472, 172 P. 1152, 1154 (1918).

9. People ex rel. Colorado Bar Ass'n v. Irwin, 60 Colo. 177, 152 P. 905, 908 (1915); Application of Harper, 84 So.2d 700, 706, 54 A.L.R.2d 1272 (Fla.1956); In re Richards, 333 Mo. 907, 63 S.W. 2d 672, 674 (1933); In re Bruen, supra note 8.

10. In re Lavine, 2 Cal.2d 324, 41 P.2d 161, 162, modified on another point, 2 Cal.2d 324, 42 P.2d 311 (1935); De Krasner v. Boykin, 54 Ga.App. 29, 186 S.E. 701, 703–704 (1936); State ex rel. Clark v. Shain, 343 Mo. 542, 122 S.W.2d 882 (1938); Ruckenbrod v. Mullins, 102 Utah 548, 133 P.2d 325, 330, 144 A.L.R. 839 (1943).

11. Commonwealth ex rel. Ward v. Harrington, 266 Ky. 41, 98 S.W.2d 53, 57 (1936); In re Pate, 107 S.W.2d 157, 159, 162 (Mo.Ct.App.1937).

12. In re Hallinan, 43 Cal.2d 243, 272 P. 2d 768, 775 (1954); In re Association of Bar, 222 App.Div. 580, 227 N.Y.S. 1, 8–10 (1928).

13. See Saier v. State Bar, 293 F.2d 756, 759–760 (6th Cir.), cert. denied, 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961); In re Cloud, 217 Iowa 3, 250 N.W. 160, 163 (1933).

14. Skiriotes v. State of Florida, 313 U.S. 69, 77, 61 S.Ct. 924, 85 L.Ed. 1193, 1200 (1941); Coyle v. Smith, 221 U.S. 559, 572, 31 S.Ct. 688, 55 L.Ed. 853, 860 (1911); Pollard v. Hagan, 44 U.S. (3 How.) 212, 228–229, 11 L.Ed. 565, 573 (1845).

15. Bias or prejudice sufficient to disqualify a judge is said to be "a prejudice that is directed against the party litigant and is of such a nature and character as would render it improbable that the party could have a fair and impartial trial in the particular case pending." Bell v. Bell, 18 Idaho 636, 111 P. 1074 (1910).

16. See State ex rel. Mitchell v. Sage Stores Co., 157 Kan. 622, 143 P.2d 652, 654–656 (1943), affirmed on another point, 323 U.S. 32, 65 S.Ct. 9, 89 L.Ed. 25 (1944); Haslam v. Morrison, 113 Utah 14, 190 P.2d 520, 523 (1948).

■ A second matter which we have to take into consideration is the fact that there is no other court, either state or federal, which has jurisdiction to review the administrative action of the trial committee and Board of Governors in this proceeding.[17] Under such circumstances we deem it our duty to act.[18] Should the respondent still feel that our investigation of his conduct and our decision in this case was arbitrary, irrational or discriminatory, and offensive to the fourteenth amendment, there is nothing to prevent him from seeking a writ of certiorari in the Supreme Court of the United States.[19]

■ The respondent's claim that this court has subjected him to double jeopardy and violated the doctrine of res judicata in that it has retried him on a charge of which he had been earlier tried and exonerated overlooks two basic principles. In the first place, jeopardy in either its constitutional or its common law sense, has a strict application to criminal prosecutions only.[20] A disciplinary proceeding such as we have in this case is not criminal in nature, but is sui generis, being an exercise of the inherent power and jurisdiction of this court over attorneys as officers of the court.[21]

■ Secondly, before the respondent can lay claim to a violation of the doctrine of res judicata in his case, he must show that the action of the Board of Governors, in voting to concur in the minority report of the trial committee that the respondent's conduct did not call for any disciplinary action, constituted a final judgment in the proceeding.[22] That he cannot do, for a statute on the books at the time the Board of Governors cast its vote required that "[u]pon receiving the findings and recommendations, the [Supreme] Court shall * * * issue an order of disbarment, suspension, reinstatement, dismissal, or otherwise, in full accordance with the recommendations of the Board of Governors * * *."[23] Under that statute it is the order of this court which constitutes the final judgment in the case. That order was ours to make even though it went contrary to the findings of the Board;[24] for, as we ruled in the original opinion, insofar as the

17. See Theard v. United States, 354 U.S. 278, 281, 77 S.Ct. 1274, 1 L.Ed.2d 1342, 1344 (1957); Green v. Elbert, 63 F. 308 (8th Cir. 1894).

18. See State ex rel. Mitchell v. Sage Stores Co., 157 Kan. 622, 143 P.2d 652, 656–657 (1943), affirmed on another point, 323 U.S. 32, 65 S.Ct. 9, 89 L.Ed. 25 (1944); Brinkley v. Hassig, 83 F.2d 351 (10th Cir. 1936), wherein the court held that the fact of disqualification may be overcome in the appropriate case under the doctrine of necessity, stating at 357:
"If the law provides for a substitution of personnel on a * * * court, or if another tribunal exists to which resort may be had, a disqualified member may not act. But where no such provision is made, the law canot be nullified or the doors to justice barred because of prejudice or disqualification * * *."

19. Cohen v. Hurley, 366 U.S. 117, 122–124, 81 S.Ct. 954, 6 L.Ed.2d 156, 161–162 (1961); Konigsberg v. State Bar, 366 U.S. 36, 44–45, 81 S.Ct. 997, 6 L.Ed. 2d 105. 113 (1961); Schware v. Board of Bar Examiners, 353 U.S. 232, 238–

239, 248–249, 77 S.Ct. 752, 1 L.Ed.2d 796, 801–802, 807 (1957).

20. People v. Silverstein, 121 Cal.App.2d 140, 262 P.2d 656 (1953); Rupert v. State, 9 Okl.Cr. 226, 131 P. 713, 714, 45 L.R.A.,N.S., 60 (1913).

21. In re Sparrow, 338 Mo. 203, 90 S.W.2d 401, 404 (1935); In re Ries, 131 N.J.L. 559, 37 A.2d 417 (1944).

22. "The rule of res judicata is that a final judgment or decree on the merits by a court of competent jurisdiction is conclusive of the rights of the parties or their privies in all later suits on the points and matters determined in the former suit. American S.S. Co. v. Wickwire Spencer Steel Co., 8 F.Supp. 562, 566 (S.D.N.Y.1934).

23. SLA 1955, ch. 196, § 14, as amended by SLA 1960, ch. 178, § 6 [now AS 08.08.-220].

24. See the dictum of the court in In re Falzone, 240 Mo.App. 877, 220 S.W.2d 765, 774 (1949), that a bar committee's action in failing to file an information after investigating an attorney's alleged misconduct did not become res adjudicata,

statute attempted to impose upon this court the mandatory duty of issuing an order in full accordance with the recommendation of the Board, it was unconstitutional for being an invasion of the inherent power of the court to discipline and disbar members of the Alaska Bar Association.

In our original opinion in this case we pointed out that, whereas a majority of the trial committee had recommended suspension, the affirmative vote of four members of a nine-man Board of Governors had caused the adoption of a motion to follow the recommendation of the one-man minority of the trial committee that the charges be dismissed.

We expressed disapproval of the fact that the president and one other member of the Board had failed to vote on the motion with no explanation in the minutes for such failure to vote.

 We have since been advised that, although the minutes of the meeting may not have so reflected, the abstaining member of the Board had actually obtained the approval of the Board to abstain from voting. We have also been advised that it was the practice of the Board, operating under Robert's "Rules of Order," [25] that the president not vote except to break a tie. Under these circumstances, the president and Board member involved are not deserving of any censure or blame for their failure to vote.

 This brings us to the respondent's argument that the penalty of disbarment was too severe in his case.

In assessing the penalty of disbarment, we were influenced by the fact that the respondent, by his own figures, had enriched himself in the amount of $7,500 at the expense of his client, Mary Hill Keno, and

by the fact that the transcript reflected that he felt that he had done nothing unbecoming an attorney and had no apparent intention of making things right with Mary by offering to restore to her the profit which he wrongfully realized at her expense.

As noted in footnote 9 to our original opinion, we were guided to some extent by the decision in In re Park [26] where the respondent attorney had commingled funds and had used small amounts of money belonging to his client, but with the intention of replacing the funds. The Board of Governors had recommended a ninety-day suspension but the court ordered disbarment. In another disciplinary proceeding— In re Fagan [27]—the attorney involved had failed to apply $1,680.96 to the discharge of a real estate lien after he had been entrusted to do so and had not made restitution or offered to do so. Disbarment was ordered.

In contrast with the respondent's previous attitude toward the offense, we are now advised by him in his petition for rehearing that

"The reason petitioner [respondent] has, in the words of the Court, 'done nothing to make things right with Mary' * * * is that respondent was advised by his counsel and informed by the decision of the Board of Governors to the effect that respondent was not guilty of wronging Mary Keno. Petitioner unequivocally states and represents to this Court, however, that he has absolutely no desire to retain any profit or monetary advantage in any way connected with any of respondent's dealings with his client, if such dealings are, in law or in fact, improper, unethical or morally wrong."

"for no action of a Committee could be allowed to frustate the courts in their right and duty to exercise final control over all disbarment matters."

25. Article VII, Section 5, of the By-Laws of the Alaska Bar, adopted by the Board of Governors on June 20, 1955, provides:

"PARLIAMENTARY RULES. Proceedings at any meeting of the Alaska Bar shall be governed by Robert's 'Rules of Order.'"

26. 45 Wash.2d 383, 274 P.2d 1006 (1954).

27. 42 N.J. 513, 201 A.2d 711 (1964).

In view of the respondent's apparent willingness to make restitution and the flexibility permitted by an order of suspension with a condition attached to applying for reinstatement, we are now convinced that more good can be accomplished by setting aside the order of disbarment, ordering respondent's suspension from the practice of law for a period of one year and until reinstated, and further ordering that respondent's reinstatement at the termination of the suspension shall be conditional upon his showing that he has paid to Mary Hill Keno, or her heirs, executors or administrators, or the State of Alaska, if appropriate,[28] the sum of $7,500[29] within three months after the date of the publication of this opinion, and it is

So ordered.

On Petition for Reconsideration.

Before NESBETT, C. J., and DIMOND, J.

NESBETT, Chief Justice.

Respondent petitions the court to reconsider its order of February 8, 1965 suspending him from the practice of law for a period of one year, with reinstatement made conditional upon a showing that restitution in the sum of $7,500.00 had been made to his former client.

The order of suspension followed the decision of this court dated January 30, 1965, made after rehearing. Our original decision in this matter was published on October 26, 1964 as Opinion No. 257. On November 5, 1964 we granted rehearing pursuant to Alaska Supreme Court Rule 35 and requested the filing of a brief in support of the points mentioned in the petition.

■ No provision is made in Alaska's rules of court procedure for a petition for reconsideration of a decision which has been made after rehearing. Technically, no matter was before the court for decision by reason of the motion for reconsideration. Since respondent had pending before the

28. The basis for our mention of the State of Alaska as a possible recipient of the the $7,500 is the following letter which we received from the Attorney General of Alaska and which constituted our first awareness of the unusual disposition made of the respondent's case by the Board of Governors:

"August 6, 1964

"Mr. Ernest Rehbock
Trustee for the Alaska
 Bar Association
941 Fourth Avenue
Anchorage, Alaska

"Re: Mary Hill
 Keno

"Dear Mr. Rehbock:

"We are presently attempting to obtain satisfaction of the State of Alaska's claim against Mary Hill Keno. Mrs. Keno is presently a recipient of state aid. Over six thousand dollars ($6,000) in assistance has already been granted her.

"Our investigation in this case indicates that the attorney who represented Mrs. Keno on matters involving her property may have taken advantage of his relationship with Mrs. Keno and may have defrauded her of an unknown amount of property. Mrs. Keno is known to have been wealthy at one time. Our investiga-

tion discloses that the attorney involved was prosecuted by the Alaska Bar Association in 1959 for his actions in connection with the property of Mrs. Keno.

"We would like to obtain the records of the proceedings before the Alaska Bar Association in order to determine whether the state may have an action to set aside a fraudulent conveyance of Mrs. Keno's property. Our files indicate that Mr. Neil Mackay was Mrs. Keno's attorney in this case.

\* \* \* \* \*

"Very truly yours,
WARREN C. COLVER
ATTORNEY GENERAL
\* \* \* "

The figure of "over six thousand dollars" mentioned in the letter of the Attorney General may have increased considerably by additional state aid given to Mary since August 6, 1964.

29. We arrived at the repayment figure of $7,500 required of the respondent by using his admitted net gain of $5,500 from his dealings with Mary over her Gambell Street property and by adding thereto the $2,000 which he received from the sale of the Murto note and mortgage.

Supreme Court of the United States a petition for certiorari, it is doubtful that this court had jurisdiction to act on his petition for reconsideration. However, on November 4, 1965 the United States Supreme Court granted respondent's motion to defer decision on his pending petition for certiorari until this court had acted on his motion for reconsideration. In view of this circumstance, this court has undertaken to dispose of the motion for reconsideration.

The petition is alleged to be based upon events which have occurred and grounds which have arisen since respondent filed his petition for rehearing on November 3, 1964. The new facts relied upon were set forth in the affidavit of petitioner attached to his petition. Since petitioner's statements of fact and legal conclusions contained in the affidavit are inaccurate in many respects it will be necessary to comment thereon at some length before the legal arguments can be considered in perspective.

In paragraph 1 of his affidavit petitioner alleges that the grievance complaint which initiated this disciplinary proceeding was duly dismissed by the Board of Governors of the Alaska Bar Association, acting pursuant to statute and the rules of the association and that under the statute and the rules an adjudication of dismissal by the Board of Governors was not subject to redetermination by the Supreme Court of Alaska.

The above allegation is not an event which has occurred or a ground which has arisen since the petition for rehearing was filed on November 3, 1964. The identical ground was advanced and briefed by counsel for respondent and argued by him at the hearing held before this court on September 24, 1964. The contention was disposed of in the opinion of this court published on October 26, 1964,[1] wherein it was pointed out that the complaint

filed against respondent and the trial proceedings conducted by the Alaska Bar Association were pursuant to Rules 7, 8 and 9, promulgated by the Board of Governors pursuant to the authority vested in it by S.L.A.1955, ch. 196, § 8.[2] That opinion pointed out that the statute in effect at the time the bar association trial committee and the Board of Governors acted in this matter stated in part:

Upon finally determining any cause involving the discipline, disbarment, suspension or reinstatement of a member of the Alaska Bar, the Board of Governors *shall certify its findings and recommendations thereon to the Supreme Court of Alaska.* Upon receiving the findings and recommendations, the Court shall, within thirty days thereafter, issue an order of disbarment, suspension, reinstatement, dismissal, or otherwise, in full accordance with the recommendations of the Board * * *.[3] [Emphasis supplied.]

The finding of a majority of two of the bar association trial committee was that respondent had overreached his client and recommended that respondent be suspended from the right to practice law for six months. A one member minority of the trial committee reported that he found nothing in respondent's conduct which called for disciplinary action. By a vote of 4 to 2, the Board of Governors adopted the recommendation of the dissenting member of the trial committee that no discipline be imposed.

In its opinion this court held that the above quoted statute required the Board of Governors to certify its findings and recommendations to this court and noted that the board had failed to observe this requirement of the statute. The holding was that even though the board had seen fit to adopt the trial committee minority report and recommendation and to dismiss the proceeding, it was nevertheless bound by the wording of the statute which stated

---

1. In the Matter of Mackay, Opinion No. 257, at 2 (Alaska, October 26, 1964).

2. § 35–2–77h ACLA Cum.Supp. (1957).

3. § 35–2–77n ACLA Cum.Supp. (1957), as amended, SLA 1960, ch. 178, § 6.

that the "* * * Board of Governors shall certify its findings and recommendations thereon to the Supreme Court of Alaska."

In our opinion of October 26, 1964 we also held that that portion of the above quoted statute which stated:

Upon receiving the findings and recommendations, *the Court shall,* within thirty days thereafter, *issue an order* of disbarment, suspension, reinstatement, dismissal, or otherwise, *in full accordance with the* recommendations of the Board * * * [Emphasis supplied.]

insofar as it attempted to impose upon this court the mandatory duty of issuing an order in full accordance with the recommendation of the board, was unconstitutional for being an invasion of the inherent power of the court to discipline and disbar members of the Alaska bar. In support of this holding we cited the representative authorities noted below.[4] After rehearing we reiterated our belief in the doctrine of the inherent power of this court over the suspension and disbarment of Alaska attorneys in In the Matter of Mackay, Opinion

No. 279 (Alaska, January 30, 1965) and cited additional authorities as noted below.[5]

 It is established by our previous decisions that even if the Board of Governors had certified its findings and recommendation of dismissal to this court as required by statute, this court would not have been required to act as a rubber stamp for the board and dismiss the matter, but that it had the power and duty to review the record, findings and recommendation and make a redetermination of the case before issuing its final order in the event it felt impelled to do so. Under those decisions any final order issued by the court need not have been "* * * in full accordance with the recommendations of the Board * * *" as the statute purported to require.

Paragraph 2 of the affidavit indicates that respondent misinterprets our Opinion No. 257 of October 26, 1964. In this paragraph he alleges that on April 7, 1964 this court issued its Order No. 64 promulgating new rules for the government of the Alaska Bar Association, effective June 1, 1964, and that sections 13 and 14 of Rule 9 of these rules provided that this court

---

**4.** In re Sullivan, 64 Ariz. 337, 170 P.2d 614, 615 (1946) ; In re Accusation, by Walker, 32 Cal.2d 488, 196 P.2d 882 (1948) ; Martin v. Davis, 187 Kan. 473, 357 P.2d 782, 787-88 (1960), appeal on other point dismissed sub nom. Martin v. Walton, 368 U.S. 25, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961) ; In re Farris, 229 Or. 209, 367 P.2d 387, 397 (1961) ; Ruckenbrod v. Mullins, 102 Utah 548, 133 P.2d 325, 330, 144 A.L.R. 839 (1943) ; In re Paul, 17 Alaska 360, 366-68 (D. Alaska 1957) ; In the Matter of Tribble, 94 Ariz. 129, 382 P.2d 237 (1963) ; In re Hallinan, 43 Cal.2d 243, 272 P.2d 768, 774-75 (1954) ; In re Cox, 164 Kan. 160, 188 P.2d 652, 655 (1948) ; In re Platz, 60 Nev. 296, 108 P.2d 858, 861 (1940) ; In re Olson, 116 Wash. 186, 198 P. 742 (1921), holding that the supreme court may, at its own option, examine into charges against an attorney proceeded against by the state board of bar examiners, even though the board has not recommended that his license be revoked or annulled, the court having inherent power to admit, suspend or disbar attor-

neys at law and notwithstanding statutory provision giving an attorney whose license has been revoked the right to petition the supreme court to review the board's findings; and In the Matter of Park, 45 Wash.2d 383, 274 P.2d 1006 (1954), in which the court ordered disbarment of an attorney in spite of the fact that the Board of Governors, Washington State Bar Association, had recommended only a ninety-day suspension from the practice of law. The court answered in the negative the test question taken from an earlier Washington case: "Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate *in continuing to hold him out to the public as worthy of that confidence which a* client is compelled to repose in his attorney?"

**5.** Phipps v. Wilson, 186 F.2d 748, 751 (7th Cir. 1951), In the Matter of Trask, 46 Haw. 404, 380 P.2d 751, 758 (1963) ; In the Matter of Watson, 71 Nev. 227, 286 P.2d 254, 53 A.L.R.2d 301 (1955) ; In re Bruen, 102 Wash. 472, 172 P. 1152, 1154 (1918).

could review and redetermine a dismissal by the Board of Governors.

■ This was not an event which has occurred or a ground that has arisen since respondent's petition for rehearing was filed. Moreover, the above statement is only partially correct. Sections 13 and 14 of Rule 9 of the June 1, 1964 rules provided a procedure for review. They were not a grant or a definition of the power to exercise review for they did not provide that this court "could" review in the sense that it was granting to itself the power to review the action of the Board of Governors.

■ More important, however, is the fact that paragraph 2 of the affidavit fails to recognize the essential legal foundation of Opinion No. 257. In this opinion the court clearly announced its adherence to the doctrine of the inherent power of the court with respect to discipline, as just discussed, and clearly pointed out that its review and redetermination were exercised pursuant to its inherent power under this doctrine.

■ Only after announcing in its Opinion No. 257 the doctrine which governed its review and determination and after a further statement that in the light of this doctrine a portion of the above quoted statute which purported to preclude court review, was unconstitutional, did the court mention by way of dictum that the unconstitutional portion of the statute had been superseded by sections 13 and 14 of the court's rules of June 1, 1964. By this dictum the court meant to clearly indicate that the unconstitutional statutory requirement that this court, upon receiving the recommendation "shall * * * issue an order * * * in full accordance with the recommendations of the Board", had been superseded by that portion of the rule which provided that after review the court would dispose of the matter as it saw fit.

For other reasons it is obvious that sections 13 and 14 of the court's rules of June 1, 1964 were not a legal foundation for its Opinion No. 257, as will be more particularly pointed out later in this opinion.

It was clearly pointed out in Opinion No. 257 that respondent was charged and tried by the bar association under the provisions of the 1955 territorial statute, as amended in 1960, which created an integrated bar, and the rules later promulgated by the Board of Governors of the integrated bar [6] for processing discipline cases. In our review of the case we considered, quoted and applied the statutory law and bar association rules as they existed at the time this disciplinary action was commenced and processed by the bar in 1961. The opinion observed that the Board of Governors had failed to abide by the statute then in force, in that the Board had failed to certify its findings and recommendations to this court. It was held that that portion of the statute which required this court to issue its order in discipline cases " * * * in full accordance with the recommendations of the Board * * * " was not binding. In refusing to be bound by this provision of the territorial statute, the court relied, not upon any rule of this court, for there were no rules of court which it was practicable to apply to a proceeding which had been commenced and processed in 1961 under state statutes and bar association rules, but upon the general doctrine of the inherent power of a state supreme court over matters concerning the discipline of members of the bar of that state.

Respondent's affidavit refers to and annexes as exhibits numerous documents which were admitted into evidence or received for identification in the case of Alaska Bar Ass'n v. Nesbett, No. A-42-64 in the United States District Court for the District of Alaska at Anchorage. In the interest of accuracy and convenience it is ordered that all of the record in that case

6. The Supreme Court of Alaska did not come into existence until August 7, 1959. Prior to that date the appellate court for the U.S. District Courts for the Territory of Alaska was the United States Court of Appeals for the Ninth Circuit.

shall be considered to be a part of the record of this proceeding.

In paragraph 3 of his affidavit respondent correctly alleges that on July 29, 1964 the Alaska Bar Association brought an action in the United States District Court against the members of the Supreme Court of Alaska seeking to enjoin enforcement of that court's rules of June 1, 1964. In order that the background out of which those rules developed be known, it should be recorded that they were drafted by this court at the request of the Alaska State Senate, which passed Senate Resolution No. 39 on March 19, 1963.[7] This resolution requested the Alaska Supreme Court, with the assistance of the Alaska Judicial Council and the Alaska Bar Association to prepare suggested rules placing the bar in the judicial branch and to report and recommend to the 1964 legislative session. The Alaska Bar Association in a 1963 convention resolution requested the supreme court to draft no rules, but to leave the bar free to make its own rules, subject to a veto power by the court. The court nevertheless completed and circulated a proposed set of rules among all of the members of the bar, inviting suggestions. Many suggestions received were adopted and in January of 1964 a proposed final draft of rules was forwarded to the President of the Senate, as Resolution No. 39 had requested and subsequently the proposed rules were placed in effect by Supreme Court Order No. 64 on June 1, 1964. In a convention resolution adopted in May of 1964 the Alaska Bar Association had, in effect, requested the Board of Governors not to be governed by the court rules. When the board refused to be governed by the rules, the court by order removed the board until such time as a board was available which was willing to comply with the rules. Upon being later advised by counsel for the board that the members of the board would comply with the rules unless enforcement was stayed by the United States District Court, the court rescinded its order removing the board. At a hearing before the three judge United States District Court, that court requested both parties to settle their differences, so that the suit could be dismissed.

This brings the relation of controlling events down to the times covered by paragraph 4 of respondent's affidavit.

Respondent alleges in paragraph 4 that on December 18, 1964 the members of this court agreed with the Alaska Bar Association that this court would withdraw its rules of June 1, 1964. A more complete statement is that the members of this court met with the members of the Board of Governors and the three member American Bar Association mediation committee in Juneau, Alaska on December 18, 1964.[8] The purpose of the meeting was to discuss and attempt to compromise any controversial provisions in the June 1, 1964, Order No. 64 rules. A number of controversial provisions of the rules on discipline were compromised at this meeting by substituting related provisions of the court rules on discipline for the State of Washington, modified to suit the conditions of Alaska. As respondent alleges, a new rule on discipline known as Rule I was agreed upon. Respondent alleges that under Rule I the court does not redetermine an adjudication of dismissal by the Board of Governors and that Section 25 of Rule I caused that rule to be applied to all pending and future grievance matters. This is not entirely accurate. This section states in pertinent part:

> The provisions in the various sections of this rule shall be liberally construed for the protection of the public, the courts and the legal profession, and shall apply to all pending matters of misconduct

---

7. SLA 1963, S.R. 39.

8. This committee was composed of Alfred J. Schweppe, Esq. of the Washington bar and member of the Board of Governors of the American Bar Association; Chief Justice William M. McAllister of the Supreme Court of Oregon and Chief Justice Hugh J. Rosellini of the Supreme Court of Washington.

and reinstatement so far as may be practicable, and to all future matters notwithstanding the alleged misconduct occurred prior to the effective date hereof. To the extent that application of any provision of this rule to any pending matter shall not be practicable, the rules in effect at the time this rule becomes effective shall continue to apply. The powers invoked by the various sections of this rule are in addition to, and not a substitution for, other powers possessed by the courts of this state, and by the Attorney General.

The above wording clearly made Rule I applicable to pending discipline matters only "so far as may be practicable". To the extent that application of the rule to any pending matter was not practicable, the rules then in effect (the Order No. 64, June 1 rules) were to continue to apply.

In this paragraph 5 respondent alleges that this court made an order on October 26, 1964 disbarring him under its rules of June 1, 1964, Order No. 64. This is not so. As has already been pointed out in this opinion, the court was considering applicable state statutes at the time it published its decision of October 26, 1964 and was acting under its inherent power to discipline members of the bar.[9]

Respondent alleges in his paragraph 5 that because of the fact that rehearing had been granted on November 5, 1964 and since the court's decision setting aside the order of disbarment and substituting suspension and restitution was published on January 30, 1965 that:

> Thus this case was pending on December 18, 1964 when the members of the Court agreed at Juneau that pending and future cases would be governed by new Rule I, under which the Court would not retry a complaint dismissed by the Board of Governors. This case was still pending on January 29, 1965 when the Court made its Order 75 formally withdrawing the Order 64 (June 1, 1964) rules under

which the Court had undertaken to review this case.

■ Respondent's conclusions are basically erroneous, as we have previously pointed out, for assuming that our original review and order of disbarment of October 26, 1964 were made pursuant to the authority of a rule of court. Likewise, respondent's conclusion that this discipline matter was a pending case during the period that it was being reheard is erroneous. This court did not set aside its decision of October 26, 1964 when rehearing was granted. It merely stayed enforcement of the order of disbarment of that date, pending consideration of respondent's brief in support of the several points raised in support of his petition. The court did not "retry" the matter as respondent implies. Its decision of January 30, 1965 merely dealt with the questions raised in respondent's petition for rehearing, recognized respondent's changed attitude toward making restitution to his former client and substituted suspension with restitution, for disbarment. In short, this case was at no time a pending case within the meaning of that term as used in Rule I.

■ Further, Section 25 by its wording indicates clearly enough that Rule I was to apply to "pending" matters only "so far as may be practicable" and where its application was not practicable, then the rules previously in effect were to be applied. This section was obviously tailored to take care of the situation where a disciplinary proceeding had been partially processed under the rules of June 1, 1964 and where it would not be practicable to complete the processing under the newly adopted rule because of procedural differences. Respondent's matter had been fully processed and disposed of by decision and order and was not a pending case at the time Rule I was agreed upon.

In his paragraph 6 respondent alleges that this court's Order No. 75 inadvertently provided that the court rules of June 1,

9. Supra notes 4 and 5.

1964 should apply to pending grievance cases; that the United States District Court found that this court had not intended to repudiate the new Rule I and had corrected it nunc pro tunc by its Order No. 76. Respondent attaches as an exhibit to his affidavit copies of the United States District Court findings and judgment.

In order that respondent's allegations be placed in full perspective it is necessary to mention certain related events, all of which are reflected in Alaska Bar Ass'n v. Nesbett, supra at 843, in the United States District Court.

When the court and the Board of Governors had compromised and settled existing differences with respect to rules of discipline, a stipulation was entered into which provided that each party should take the necessary steps to place the new rules in force and that each should then join in a request to the legislature advocating specific amendments to the Alaska Bar Act [10] and that after these things had been done the pending action in the United States District Court should be dismissed.[11]

After all of the requirements of the stipulation had been satisfied, a motion to dismiss the pending action in the United States District Court was filed by the defendants. Counsel for the Alaska Bar Association opposed dismissal of the case and filed memoranda and briefs opposing the motion to dismiss on some ten different grounds. At a hearing held on the defendant's motion to dismiss on June 15,

1965 counsel for the Alaska Bar Association abandoned all of the legal arguments previously raised in opposition to the motion to dismiss and relied on only one argument—that the court had repudiated new Rule I in that its Order No. 75, providing for the transition from the June 1, 1964 rules to new Rule I, required that pending discipline cases should be processed under the June 1, 1964 rules and all cases commenced thereafter should be processed under Rule I. Paragraph 3 of Order No. 75 stated:

> 3. All disciplinary cases pending on the date Order No. 64 is vacated shall be processed in accordance with the provisions of Rule 9 of the Alaska Bar Rules, and all disciplinary cases commenced thereafter shall be processed in accordance with Rule I of the Alaska Bar Association, as approved in paragraph 2 of this Order or as thereafter amended with the approval of this Court.

Counsel for the defendants pointed out that the above paragraph had been included in the order at the specific request of the President of the Alaska Bar Association and that any inconsistency between that paragraph and Section 25 of Rule I, to the effect that new Rule I should apply to pending grievance matters so far as may be practicable, and where not practicable then the rules of June 1, 1964 should apply, was drawn to its attention for the first time on the morning of the June 14th hearing[12]. The court issued its Order No. 76 on June 16, 1965 in order to remove

---

10. The requested amendments to the Alaska Bar Act were placed in bill form by Senator Ziegler, then President of the Alaska Bar Association. The bill was passed by the Senate by a vote of 18 to 0 during the first session of the Fourth Legislature. The bill was in House Judiciary Committee when that session adjourned in April of 1965. The bill remained in House Judiciary during the entire second session and died with the adjournment of that session in April of 1966.

11. Plaintiff's Exhibit A, a copy of which stipulation is attached to respondent's affidavit as Exhibit B.

12. In this connection Deft's Ex. 9, a letter from Chief Justice Nesbett to Robert H. Ziegler, Sr., President of the Alaska Bar Association dated the 25th day of January 1965 was offered into evidence. Only the third from the last paragraph is relevant and stated:

> You mentioned Friday the possibility of the Court issuing an order providing that all pending disciplinary cases be processed under the present rules and all future cases be under the new rules, because of the great dissimilarity in the rules. This seems logical and so we have included a para-

any possibility of a conflict developing in any discipline case. Order No. 76 stated:

WHEREAS, this Court included paragraph 3 in its Order No. 75 at the suggestion of the President of the Alaska Bar Association; and

WHEREAS, it was called to the attention of this Court for the first time on June 14, 1965, that there is an inconsistency between the provisions of paragraph 3 of Order No. 75 and a provision of Rule I, Section 25, as approved by paragraph 2 of Order No. 75; and

WHEREAS, the inconsistency could lead to uncertainty in the processing of disciplinary cases pending on the effective date of Order No. 75;

Now therefore it is *ORDERED that paragraph 3 of Order No. 75 is rescinded as of the date of Order No. 75.

As respondent points out in paragraph 6 of his affidavit, the United States District Court found the inconsistency to be "inadvertent" and dismissed the pending suit in its judgment dated July 6, 1965 a copy of which is attached to respondent's affidavit as Exhibit G.

In his paragraph 7 respondent alleges that he is "plainly entitled to the benefit of Rule I" which became law prior to the date of the court's order suspending respondent from the practice of law. Again respondent overlooks the fact that the court was applying the statutes and bar rules which were in force when respondent was charged and tried when it ordered a hearing before it in spite of the action taken by a majority of the Board of Governors.

Assuming that we had disposed of respondent's case under the Order No. 64 rules when we published our decision of October 26, 1964, the matter would have been fully disposed of as of that date and remained so insofar as the Order No. 64 rules were concerned. All of the procedures provided for in those rules would have been exhausted. Rehearing was granted under the general appellate practice rules and the case was being handled under Supreme Court Rule 35 governing rehearing at the time Rule I was substituted for the Order No. 64 rules.

In connection with the foregoing assumption, it should be noted that Section 25 of Rule 9 of the June 1, 1964 rules was identical in wording with Section 25 of Rule I previously quoted herein, insofar as it provided that the rule would apply to pending discipline matters "so far as may be practicable" and to the extent that it was not practicable, the prior rules in effect should continue to apply. Therefore, even though the Order No. 64 rules had been promulgated since June 1, 1964 when this court commenced to review respondent's case in August of 1964, it would have been impracticable to commence to apply them to respondent's case which had already been processed through the Board of Governors pursuant to territorial statute and bar rules. Our previous decisions in this matter, of course, reflect that we were applying "the rules in effect at the time this rule" became effective, which were the statutes and bar rules, except for that portion of the statute which infringed on the inherent power of the court as previously discussed.

In order to honor respondent's argument it would be necessary to hold that all of the proceedings had in this case during the preceding four years, including final disposition by this court, were retroactively nullified when new Rule I was adopted on January 29, 1965. In Coughlan v. United States,[13] it was held that a repealer in the Alaska Integrated Bar Act of 1955 could not be read to obliterate a prior disbarment judgment simply because that judgment was under appeal at the date the repeal provision became effective.

graph to accomplish this in the proposed order.

The three judge district court ruled that all of the letter would be received into evidence except the paragraph above quoted.

13. 225 F.2d 677, 15 Alaska 659 (9th Cir. 1955).

Again, even if Rule I were entitled to be considered and even after Order No. 75 had been amended,[14] Section 25 of Rule 9 still expressly provided that Rule I would not be applicable to pending cases where this would not be practicable. Obviously it would not be a practicable thing to annul the entire proceedings, including final disposition in this case, and hold that the matter should be processed anew.[15]

Rule I is inapplicable to respondent's case even if we were to disregard the above quoted provision of Section 25 of this rule. On the effective date of Rule I, this disciplinary matter was not a pending case within the sound meaning of this phrase however far we may lean to accommodate respondent's point of view.

While the word "pending" has no fixed meaning and its construction depends on the legal context, it may usually be read as synonymous with or connoting "depending, remaining undecided, not terminated."[16] In connection with an administrative proceeding it was read to mean "awaiting disposing action".[17] A bankruptcy proceeding, which in fact had terminated upon closing of the estate and the discharge of the trustee, was not pending simply because the bankrupt had not yet filed an application for discharge.[18] The pendency of a criminal case was denied where defendant's case was transferred to the absentee docket, because affirmative state action would be necessary to revive the case.[19]

The question whether an adjudicated case is still "pending" as long as it is appealable or under appellate review could, according to some holdings, be resolved by construing appellate review as a new proceeding, although contrary holdings are not lacking.[20]

An answer based on more adequate reasoning was found in P. B. Realty Co. v. Wallace[21] wherein an appeal was sought from an eviction judgment, and a Rent Control Act effective after the judgment but prior to taking the appeal required approval of the Office of Rent Control before bringing such action. The Court said:

Conceding that plaintiff is correct in his argument it has no application to the case at bar for this action was not pending when the amendment became effective. The appellant is contending that the action is still pending while in a reviewing court. We cannot concur in this conclusion. We are of the opinion that the action was pending until final judgment was rendered in the trial court.

* * * G.C. § 11582 defines a judgment as 'the final determination of the rights of the parties in action'.

---

14. Supra at 847.

15. See supra note 12. The quoted paragraph of this letter, written long before the present issue was announced, illustrates that it was obviously the view of the President of the Alaska Bar Association and the court that in arranging for the transition it was not considered practicable to process any disciplinary case under Rule I except those commenced after the date of Order No. 75.

16. Stockard v. Hamilton, 25 N.M. 240, 180 P. 294 (1919).

17. Taran v. United States, 266 F.2d 561 (8th Cir. 1959).

18. In re Zimmer, 63 F.Supp. 488 (S.D. Cal.1945); In re Embassy, 58 F.Supp. 1004 (D.C.Mo.); In re Goodstein, 59 F. Supp. 685 (E.D.Pa.1945).

19. Likens v. State, 153 Fla. 887, 16 So.2d 158 (1944).

20. It was held that an appellate proceeding must be considered as a wholly new and independent action. Fowden v. Pacific Coast S.S., 149 Cal. 151, 86 P. 178 (1906); Cheever v. Minton, 12 Colo. 557, 21 P. 710, 13 Am.St.Rep. 258 (1889); Ohio-Colorado Min. & Mill. Co. v. Elder, 47 Colo. 63, 99 P. 42 (1908). But appellate proceedings have been also construed as a continuation of the same case in a higher court. See In re Lee's Estate, 240 Iowa 691, 37 N.W.2d 296 (1949), though apparently limited to an equity suit where appeal was de novo; Davis v. Fidelity & Deposit Co. of Maryland, 93 Cal.App.2d 13, 208 P.2d 414 (Dist.Ct.App.1949), but strictly on grounds of a statutory definition.

21. 93 N.E.2d 603, 604 (Ohio Ct.App.1950).

We are of the opinion that whether an action or proceeding is pending under a rule or statute depends on the purpose of the rule or statute and upon the results which pendency would have in a specific case.[22] But general orientation is provided by the polestar principle that an action is pending until a determination has been made.[23]

■■■ We notice that in the construction of "pending" in regard to an action, even under a statute, the paramount consideration is to achieve a sensible and practical result. In Sweetser v. Fox[24] a statutory provision that an action is pending until its final determination on appeal, was held not to be binding for fixing the time when the statute of limitations began to run against the judgment. It was said:

Section 3490, supra, therefore, belongs to that class of statutes wherein it was sought to declare and make certain an existing rule of practice or procedure rather than to create a new one. Moreover, when other provisions of the Code, which have a bearing upon the subject, are kept in mind and are given proper force, it, in our judgment, is conclusive that neither in adopting the rule at common law nor by what is said in the statute was it intended to declare that, although actions be pending after judgment, they are necessarily pending for all purposes. In our judgment actions remain pending after judgment only for the purpose of enforcing them and to

institute the proceedings provided by law to reverse or to modify them. For the purpose of enforcing the judgment, it is just as much final immediately after its rendition and entry in the court of original jurisdiction, unless it is expressly otherwise provided by some statute, as it is after an appeal is terminated. For the purpose of res judicata or estoppel this may, however, not be so. If this distinction be kept in mind, no difficulty will be encountered in applying the remedies incident to the enforcement of judgments.

We recognized in Theodore v. Zurich Gen. Acc. & Liab. Ins. Co.[25] that under the Alaska Statehood Act of 1958 the words "pending and determined" in reference to the caseload pending in the interim United States District Court for Alaska included cases adjudicated in the interim court and still appealable.[26] In so holding, we restricted ourselves to an interpretation of a federal statute specifically addressed to the purpose of achieving effective transfer of dockets from the territorial court to the state court system. We did not announce any general principle in regard to the construction of pending proceedings in their general meaning or as applicable to other situations.

We hold that the term "pending" as it related to disciplinary proceedings in Rule I did not include respondent's case which had been finally disposed of although rehearing had been requested and granted

22. Kase v. Kase, 18 N.J.Super. 12, 86 A. 2d 587 (Super.Ct.1952) recognizes that a court may retain limited jurisdiction, i. e. for alimony in a divorce case and that to such limited extent an action may still be pending. State ex rel. Fawcett v. Board of County Comm'rs., 73 Wyo. 69, 273 P.2d 188 (1954) states that an action was no longer pending though it was undecided where under a statute a constitutional question had been certified to the Supreme Court.

23. Wallach v. Schmer, 82 N.Y.S.2d 202 (Sup.Ct.1948) stating that the signing of findings of fact and conclusions of law

was such a final determination of a pending action.

24. 43 Utah 40, 134 P. 599, 601, 47 L.R.A., N.S., 145 (1911).

25. 364 P.2d 51 (Alaska 1961).

26. Our construction of the pertinent provision of the federal enabling act was consistent with the manner in which these acts of the Congress were previously read. United States v. Taylor, 44 F. 2 (D.C. D.C.1890) ; Hupp v. Hock-Hocking Oil & Natural Gas Co., 88 Ohio State 61, 101 N.E. 1053 (1913).

under Supreme Court Rule 35.[27] Even without reliance on a specific saving clause under Sec. 25 of Rule I, the construction of "pending" as aided by the above mentioned authorities precludes the obvious absurdity that proceedings initiated, conducted and concluded under a previous statute must be obliterated and recommenced.

This brings us to the three legal grounds urged as a basis for reconsideration.

■ Respondent's first ground is that the order of February 8, 1965 suspending respondent from the practice of law is contrary to the agreement for the conduct of pending and future grievance matters entered into by the court and the Alaska Bar Association at Juneau on December 18, 1964.

This ground has been answered in the preceding discussion of the allegations contained in respondent's affidavit. Respondent's case had been completely processed and disposed of by the court from October 26, 1964 onward, acting pursuant to statute and the court's inherent power and without reference to the authority of any rule of court. The only agreement between the court and the bar for the processing of pending and future grievance cases which might be considered as having been entered into prior to February 8, 1965 was that plainly stated in Section 25 of Rule I.

■ The second and third points are that the order suspending respondent from the practice of law deprives him of property without due process of law and denies him the equal protection of the laws in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

The petition for reconsideration does not allege how or why his constitutional rights have been violated and cites no authorities.

In points number 6, 7 and 8 of his petition for rehearing filed on November 3, 1964 respondent alleged violation of his rights to due process and equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and Article I of the Constitution of Alaska. The brief submitted in support of the petition for rehearing did not discuss the above mentioned constitutional points and cited no authorities to assist the court.

In our Opinion No. 279 of January 30, 1965, published after rehearing, we mentioned respondent's failure to discuss most of the grounds upon which his petition for rehearing was based and the fact that some of the grounds had been ignored entirely. In that opinion we nevertheless dealt with respondent's allegations that he had been deprived of his right to due process of law and equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and Article I of the Alaska Constitution.[28] We described the power under which this court acted and cited numerous authorities in support of our holding that petitioner's right to due process and equal protection had not been violated.

In that opinion we cited Phipps v. Wilson [29] which was a suit filed in a United States District Court against the seven justices of the Supreme Court of Illinois for relief from the action of that court in disbarring appellant. The judgment in favor of the defendants was affirmed. The court stated at page 751:

An attorney is an officer of the court before which he has been admitted to practice. The power to discipline or disbar such officer for unprofessional conduct is inherent in the court, and exists independent of statute. (citing Illinois authorities)

As to disbarment, due process requires only that an attorney have reasonable notice of the charges against him and a reasonable opportunity to be heard in his defense. Ex parte Wall, 107 U.S. 265, 271, 2 S.Ct. 569, 27 L.Ed. 552. The

27. Coughlan v. United States, supra note 14.

28. In the Matter of Mackay, Opinion No. 279, 4–6 (Alaska, January 30, 1965).

29. 186 F.2d 748 (7th Cir. 1951).

form of notice and the form and manner of hearing are left to the sound discretion of the court.

Respondent was charged and tried by a bar association trial committee acting pursuant to the authority of statute and rules promulgated by the Board of Governors. His case was reviewed by the Board of Governors, which rejected the recommendation of suspension made by the majority of the trial committee and adopted the recommendation of the committee minority that no discipline be imposed and the charges be dismissed. The Board did not certify its findings and recommendation of dismissal to this court as required by statute and it was not until August of 1964 that this court was apprised of the case in a communication from the Attorney General of Alaska, who was seeking to recover from respondent property obtained by him from his client. The court obtained copies of the pleadings, findings, decisions and a full transcript of the trial proceedings. After reviewing the record, the court advised respondent that it had only recently become aware of the disposition of his case by the Board, that it did not intend to be bound by the action of the Board and offered to hear respondent on a date certain before a private session of the court before it issued its order in the case. Respondent's counsel requested and was granted a hearing continuance. The entire record was loaned to respondent's counsel so that he could prepare for the hearing. Respondent then filed a three pronged motion to dismiss and memorandum of authorities. Oral argument before the court was had. Thereafter respondent filed a supplemental motion to dismiss based upon eight grounds, two of the grounds being denial of due process under the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 7 of the Constitution of Alaska and deprivation of due process of law. After oral argument respondent was allowed five weeks in which to file a brief in support of his legal position. A 34 page brief containing numerous exhibits was then filed. After the court's Opinion No. 257 was published, rehearing was granted. Respondent filed an additional brief which was considered before our Opinion No. 279 was published.

It is obvious from the above that respondent was accorded adequate notice and a full opportunity to be heard and that his right to due process was not violated.

In passing on the constitutional question raised but not briefed by respondent we cited Saier v. State Bar,[30] which was a suit against the justices of the Supreme Court of Michigan and certain officers of the State Bar of Michigan. In passing on appellant's claim of deprivation of rights, privileges and immunities, of life, liberty, or property and equal protection of the laws under the United States Constitution, the court said at page 759:

Not only has he not suffered, according to the allegations of his complaint, any deprivation of a right under the Federal Constitution as a matter of fact, but legally no such right as he claims is guaranteed to him by the Federal Constitution.

License to practice law, the continuation of such license, regulation of the practice and the procedure for disbarment and discipline are all matters that are within the province of an individual state.

\* \* \* \* \* \*

In In re Lockwood, Petitioner, 154 U.S. 116, at page 117, 14 S.Ct. 1082 at page 1083, 38 L.Ed. 929, the court said:

'In Bradwell v. The State, 16 Wall. 130 (83 U.S. 130), [21 L.Ed. 442,] it was held that the right to practice law in the state courts was not a privilege or immunity of a citizen of the United States; *that the right to control and regulate the granting of license to practise law in the courts of a State is one of those powers that was not transferred*

---

30. 293 F.2d 756, 759–760 (6th Cir.), cert. denied, 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961).

*for its protection to the federal government,* and its exercise is in no manner governed or controlled by citizenship of the United States in the party seeking such license.' (Emphasis added.)

In Theard v. United States, 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342, 1344 (1957) the court said:

It is not for this Court, except within the narrow limits for review open to this Court, as recently canvassed in Konigsberg v. State Bar of California, 353 U.S. 252, [1 L.Ed.2d 810,] 77 S.Ct. 722, and Schware v. Board of Bar Examiners, 353 U.S. 232, [1 L.Ed.2d 796,] 77 S.Ct. 752, to sit in judgment on Louisiana disbarments, and we are not in any event sitting in review of the Louisiana judgment. While a lawyer is admitted into a federal court by way of a state court, he is not automatically sent out of the federal court by the same route. The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court.

See Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917); In the Matter of Crow, 283 F.2d 685 (6th Cir. 1960), cert. denied, 376 U.S. 647, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964).

Respondent's case has been processed under the same laws as would have governed the processing of any other disciplinary matter handled at those times and he has not been denied the equal protection of the laws.

The petition for reconsideration is denied.